[No. C017509. Third Dist. Mar. 17, 1995.]

ALFRED O. COUCH, Plaintiff and Appellant, v.
SAN JUAN UNIFIED SCHOOL DISTRICT, Defendant and Respondent.

## COUNSEL

Steven T. Seligman for Plaintiff and Appellant.

Edson & Laplante, Domenic D. Spinelli and Bradley E. Neunzig for Defendant and Respondent.

## OPINION

**SIMS, Acting P. J.**—Plaintiff Alfred O. Couch worked as a campus security officer, or "monitor," at Rio Americano High School in Carmichael. On arriving at work on the morning of February 28, 1992, he was shown a portion of an article in that day's edition of the school newspaper. He concluded, without reading the rest of the article, that it accused him of being, among other things, a murderer and a drug dealer. Despite the apologies of the article's authors, he resigned his position, claiming that he could no longer feel comfortable working at the school. He then sued defendant San Juan Unified School District (the District), which operates Rio Americano High School, alleging libel, invasion of privacy, and emotional distress. The second and third counts were dismissed on demurrer; the

libel count fell to defendant's motion for summary judgment. Plaintiff appeals, seeking the reinstatement of all three counts. We shall affirm.

FACTS

Plaintiff was first employed as a campus monitor at Rio Americano High School in 1991. Following a leave of absence, he returned to work on February 11, 1992. From February 11, 1992, to February 28, 1992, he was the only African-American employee at the school, whose student body was overwhelmingly White. Plaintiff's job duties included breaking up student fights, confiscating drugs and alcohol from students, and bringing students into the principal's office for use or possession of drugs.

In the February 28, 1992, issue of the school newspaper, the Rio Mirada, an article called *Raider Final* appeared. It begins on page 4, a page headed "Entertainment," and continues onto page 11.[1] It carries the following bylines: "[B]y Matt (Nice N' Easy) Aldrich, Shane (The Man) Mc Kinney, Paul (Fat Boy) D'Albora."[2]

The *Raider Final* consists of an introduction, 10 multiple-choice questions, and a key to the scoring of the questions. The introduction reads: "Welcome to hell. The following is a test of your virility, agility, and the ability to master the functions of your spleen, colon, and urinary tract. This is a comprehensive test of your knowledge of Rio sub-cultures. Proceed with caution and answer all questions with a number two pencil. You may begin . . . now."

Most of the questions deal with recent events or topical concerns at the school (e.g., "Why has it been so long since the last issue of the *Mirada*?"; "Why should condoms be distributed at Rio?"; "What happened at Rio on President's Day?"). A few venture more broadly into pop culture (e.g., "Hey, why did they change my Pepsi can?"; "What are the new exhibition sports for the '92 Winter Olympics?"; "Since we don't know if Michael Jackson's 'Black or White,' the next question is, 'Gay or Straight'?"). All questions have four possible answers, most self-evidently absurd, some arguably vulgar or tasteless. The key to the scoring reads: "If you scored less than 10 points, you're a loser. Try again[,] Big Guy. [¶] If you scored 10 to 25

---

[1] We reproduce the entire *Raider Final* in the appendix.

[2] All three writers are identified on the paper's masthead (without nicknames) as reporters for the paper. Mc Kinney's byline (also without nickname) appears above a concert review on page 4, next to the *Raider Final.*

points, you can bite my Magic Bus. [¶] If you scored 26 to 40 points, you were reaching just a little bit too much. . . . [¶] If you scored over 40 points, take about a three-day recess from the drugs[,] psycho."

Question 5, the material giving rise to this lawsuit, reads as follows: "5. What's the story behind the new narc? [¶] (a) They felt that we needed someone who's actually committed murder to hand out discipline at Rio. [¶] (b) They wanted to find someone who blends in well with the students. [¶] (c) He's a part of Rio's new motto, 'We're gonna kick some ass!' [¶] (d) I don't know his story, but he sells primo drugs, cheap too!"

Soon after plaintiff arrived at work on February 28, 1992, a teacher called question 5 to his attention, saying, "You know that they're talking about you." Plaintiff then read question 5. He did not read any other part of the *Raider Final*, either then or later. Aside from the classified section of the Sacramento Bee, he "[doesn't] read the paper."[3]

On reading question 5, plaintiff concluded that it was about him and that it accused him of being a murderer, a drug dealer, and a bully. He also interpreted answer (b) ("They wanted to find someone who blends in well with the students") as a racial slur. He became very angry.

Shortly afterward, plaintiff met with a vice-principal, the Rio Mirada's faculty advisor, its student editor, and the authors of the *Raider Final*. The authors told plaintiff that question 5 was not about him.[4] Nevertheless, they apologized to him in person; they also drafted a written apology which was distributed to every classroom in the school and read over the school's public address system on the morning of February 28, 1992.[5]

After the meeting, plaintiff left the school. He returned the next work day only to submit his written resignation on grounds of "[u]npleasant working conditions" and "slanderous remarks."

---

[3]This statement, given in deposition, presumably encompasses the Rio Mirada. Nothing in the record shows that plaintiff has ever read the Rio Mirada, aside from question 5.

[4]According to their depositions, "the new narc" was David Jandes, a White campus monitor who worked at the school from January 7, 1992, to February 7, 1992, and who had a tough, "macho" style. Jandes testified at his deposition that when he read question 5 (long after its publication) he thought it "fit[] [him] perfect."

The authors stated that although the article came out at the end of February it was written and delivered to the editor early in the month.

[5]The written apology did not specifically mention either plaintiff or question 5. According to the authors, these omissions were meant to avoid calling attention to plaintiff as the possible subject of question 5.

In March 1992 plaintiff filed a claim for damages against the District, which was rejected.

In August 1992 plaintiff filed a complaint against the District, which was replaced by a first amended complaint in September 1992. Therein he alleged that the statements in question 5 of the *Raider Final* were made "of and concerning him," that they were false and libelous on their face, that their publication invaded his privacy, and that as a result of their publication he had been forced to discontinue his employment at Rio Americano and had suffered emotional distress.

Defendant demurred to counts 2 and 3 of the first amended complaint ("false light" invasion of privacy, emotional distress) on the grounds that both were redundant to the libel count and failed to state facts sufficient to constitute a cause of action. The trial court sustained the demurrer to count 3 without leave to amend; the court sustained the demurrer to count 2 with leave to amend, but plaintiff failed to amend thereafter.

After answering the complaint, defendant moved for summary judgment on plaintiff's cause of action for libel, the sole remaining count. Defendant contended first that the *Raider Final* cannot constitute actionable libel because it cannot reasonably be understood as implying a provably false assertion of fact, second that it is not "of and concerning" plaintiff.

Plaintiff filed a cross-motion for summary adjudication of all disputed issues.

Following further responsive pleadings, the trial court issued a tentative ruling in defendant's favor, which it affirmed after argument. The tentative ruling reads as follows: "In a libel action it is for the court to decide in the first instance whether the statements in a publication would reasonably be understood as assertions of fact as opposed to hyberbole [*sic*], or loose figurative expression. *Weller* v. *American Broadcasting Companies, Inc.* (1991) 232 C.A.3d 991, 1002[,] fn. 9 [283 Cal.Rptr. 644]. The question of whether the average reader would recognize the article as a parody or joke depends upon a view of the entire article, i.e., the 'totality of circumstances.' *San Francisco Bay Guardian, Inc.* v. *Superior Court* (1993) 17 C.A.4th 655, 659 [21 Cal.Rptr.2d 464]. Furthermore, the proper focus of judicial inquiry in a case such as this is simply whether the communication in question could reasonably be understood in a defamatory sense by those who received it. *Polygram Records, Inc.* v. *Superior Court* (1985) 170 C.A.3d 543, 553-554

[216 Cal.Rptr. 252]. Applying the above legal standard to the statements at issue, the court finds that the average reader, as a matter of law, upon viewing the article in its entirety, would recognize it as a parody or joke and not as assertions of fact. In this case, the average readers were the faculty and student body of Rio Americano High School, since it was undisputed the *Raider Final* was not published outside of Rio Americano High School. A review of the entire *Raider Final*, consisting of 10 multiple-choice questions, leads the court to conclude it could not have reasonably been understood in a defamatory sense by those who received it. Although the court has its own opinion of the article, it is not for the court to evaluate the parody as to whether it went too far. As long as it is recognizable to the average reader as a joke, it must be protected. *San Francisco Bay Guardian, supra,* at 662. Defendant's motion for summary judgment is therefore granted, plaintiff's counter-motion for summary adjudication of issues is therefore denied."

The court thereafter entered judgment for defendant.

## DISCUSSION

### I

A motion for summary judgment is properly granted if the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) A defendant moving for summary judgment must show either that one or more essential elements of the plaintiff's cause of action cannot be separately established or that there is an affirmative defense which bars recovery. If the plaintiff fails to set forth specific facts showing a triable issue of material fact as to that cause of action or defense, summary judgment must be granted. (Code Civ. Proc., § 437c, subds. (n), (o)(2).) We independently review the parties' papers supporting and opposing the motion, using the same method of analysis as the trial court. (*AARTS Productions, Inc.* v. *Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064-1065 [225 Cal.Rptr. 203].)

Summary judgment is a favored remedy in defamation and invasion-of-privacy cases due to the chilling effect of protracted litigation on First Amendment rights. (*Aisenson* v. *American Broadcasting Co.* (1990) 220 Cal.App.3d 146, 154 [269 Cal.Rptr. 379].) "[T]he courts impose more stringent burdens on one who opposes the motion and require a showing of high probability that the plaintiff will ultimately prevail in the case. In the absence of such showing, the courts are inclined to grant the motion and do

not permit the case to proceed beyond the summary judgment stage." (*Sipple* v. *Chronicle Publishing Co.* (1984) 154 Cal.App.3d 1040, 1046 [201 Cal.Rptr. 665]; accord, *Wasser* v. *San Diego Union* (1987) 191 Cal.App.3d 1455, 1461 [236 Cal.Rptr. 772].)

## II

In its written opposition to defendant's motion for summary judgment, plaintiff conceded it was undisputed that the *Raider Final* was not published outside Rio Americano High School. At the hearing on the motion, however, plaintiff sought to introduce evidence that question 5 had been published in full in the Sacramento Union on August 5, 1992, and in the Sacramento News and Review on August 19, 1993, and that it had also been published in part in the Sacramento Bee of August 4, 1992, and the Union of July 9, 1993. Defendant objected to the proffered evidence because plaintiff had not alleged in his complaint that he was defamed on any of those dates and because plaintiff had not stated even now who caused the statements to be published in these media.[6] The trial court did not rule on the admissibility of this evidence during the hearing, but impliedly excluded it thereafter by reaffirming its tentative ruling (which found that question 5 had not been published outside Rio Americano High School) and by noting in its order granting summary judgment that it had considered all the evidence "except that to which objection has been sustained."

Plaintiff contends that the trial court erred by excluding this evidence. He argues that it is relevant because (1) it expands the class of persons comprising the "average reader" whose likely response to question 5 must be assessed in order to decide whether question 5 could reasonably be understood as defamatory (see *Baker* v. *Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 261-263, 267-268 [228 Cal.Rptr. 206, 721 P.2d 87]; *Morningstar, Inc.* v. *Superior Court* (1994) 23 Cal.App.4th 676, 688 [29 Cal.Rptr.2d 547]), and (2) it shows that a substantial number of persons read question 5 apart from its original context in the Rio Mirada, on which defendant relied to rebut the claim of libel.[7] Plaintiff is mistaken.

It is the pleadings which delimit the scope of the issues on summary judgment. (*FPI Development, Inc.* v. *Nakashima* (1991) 231 Cal.App.3d 367, 381 [282 Cal.Rptr. 508].) Here, plaintiff pleaded in both his original complaint and his first amended complaint that he was defamed *only* by the

---

[6]Defendant later filed its objection in writing.
[7]We discuss the legal implications of these contentions more fully in part III, *post.*

publication of question 5 in the Rio Mirada on February 28, 1992. Moreover, his claim of injury and damages rests squarely on the premise that this publication on this date rendered his continued employment at Rio Americano High School impossible.

"It is well settled that documentary evidence filed in opposition to a defendant's motion for summary judgment may not create issues outside the pleadings, nor is it a substitute for an amendment of the pleadings." (*Robinson* v. *Hewlett-Packard Corp.* (1986) 183 Cal.App.3d 1108, 1132 [228 Cal.Rptr. 591].) If plaintiff wanted to alter the theory of his complaint by alleging republications of the alleged libel with additional resulting injury and damages, he should have sought leave to amend his complaint so as to add these allegations. They were not relevant to the theory of the complaint as it stood. The trial court properly excluded them.

### III

Plaintiff contends that even without the additional allegations discussed above, his complaint was sufficient to withstand summary judgment because question 5 is reasonably capable of being understood as defamatory as a matter of law. He is wrong.

Whether published material is reasonably susceptible of an interpretation which implies a provably false assertion of fact—the dispositive question in a defamation action—is a question of law for the court. (*Morningstar, Inc.* v. *Superior Court, supra,* 23 Cal.App.4th at pp. 686-687; *Moyer* v. *Amador Valley J. Union High School Dist.* (1990) 225 Cal.App.3d 720, 724 [275 Cal.Rptr. 494].) This question must be resolved by considering whether the reasonable or "average" reader would so interpret the material. (*Baker* v. *Los Angeles Herald Examiner, supra,* 42 Cal.3d at pp. 261-263, 267-268; *Morningstar, supra,* 23 Cal.App.4th at p. 688; *San Francisco Bay Guardian, Inc.* v. *Superior Court* (1993) 17 Cal.App.4th 655, 658-659 [21 Cal.Rptr.2d 464] (*S.F. Bay Guardian*).) The "average reader" is a reasonable member of the audience to which the material was originally addressed. (*Baker, supra,* 42 Cal.3d at pp. 261-263, 267-268 [reader of newspaper review of television program]; *Morningstar, supra,* 23 Cal.App.4th at p. 688 [subscriber to financial newsletter]; *S.F. Bay Guardian, supra,* 17 Cal.App.4th at pp. 658-659 [reader of April Fool parody insert in alternative newspaper]; see *Polygram Records, Inc.* v. *Superior Court* (1985) 170 Cal.App.3d 543, 556-557 [216 Cal.Rptr. 252] [member of audience of comedian's nightclub monologue].)

Statements intended as humor or parody "may in certain circumstances convey a defamatory meaning and be actionable even if the words

used could not be understood in their literal sense or believed to be true." (*Polygram Records, Inc.* v. *Superior Court, supra,* 170 Cal.App.3d at p. 553.) However, if the reasonable reader or hearer of the statements would understand that they could not have been intended to convey a provably false assertion of fact, but were clearly a mere joke or parody, there is no defamation as a matter of law. (*S.F. Bay Guardian, supra,* 17 Cal.App.4th at pp. 658-662; *Polygram Records, Inc., supra,* 170 Cal.App.3d at pp. 551, 554-558; *Yorty* v. *Chandler* (1970) 13 Cal.App.3d 467, 473-474 [91 Cal.Rptr. 709].) As in any other defamation action, the statements must be considered in their original context with respect to the totality of the circumstances. (*Baker* v. *Los Angeles Herald Examiner, supra,* 42 Cal.3d at pp. 260-261.)

In *S.F. Bay Guardian, supra,* the plaintiff asserted that he was defamed by the publication of a letter purportedly written by him in the March 27, 1991, issue of the Bay Guardian, a weekly "alternative" newspaper. Plaintiff, a San Francisco real property owner who had been engaged in legal battles with the City of San Francisco over his attempts to rent to tourists in alleged violation of the city's Residential Hotel Ordinance, supposedly wrote to the Bay Guardian as follows: "I don't understand why Vince Bielski is so upset about electroshock therapy. I find that my tenants who have undergone this treatment are much more cooperative." The letter was signed with plaintiff's name and printed under the caption "Rent Control." (*S.F. Bay Guardian, supra,* 17 Cal.App.4th at p. 657.) The letter did not appear in the main part of the paper, but in an insert identified on the paper's contents page—under the heading April Fool!—as a "special parody section" and inserted in the paper upside down. This section also included "mock articles and pictures, some of which are recognizable as jokes at first glance," along with other material in which the spoofing was "not so obvious" but which, if perused, "would raise reality questions . . . ." (*S.F. Bay Guardian, supra,* 17 Cal.App.4th at pp. 659-660.) Plaintiff produced five declarations from persons other than himself who stated they had read the letter purportedly by him and did not recognize it as part of a parody. The trial court denied defendant's motion for summary judgment. (*S.F. Bay Guardian, supra,* 17 Cal.App.4th at p. 658.)

The appellate court reversed, holding: "Review of the full context in which the fake letter appeared leads us to conclude that the average reader, as a matter of law, would recognize that the letter was a part of the parody and not actually written by [plaintiff]." (*S.F. Bay Guardian, supra,* 17 Cal.App.4th at p. 659.) The court also noted that the declarations submitted by plaintiff did not require a different conclusion: "The fact that [plaintiff]

furnished declarations of a few people who stated that they did not recognize the letter as a joke does not raise a question of fact as to the view of the average reader. The question is not one that is to be answered by taking a poll of readers but is to be answered by considering the entire context in which the offending material appears. . . . In the instant case, the April Fool's section of the paper was obviously and unambiguously a parody of the regular edition which could not be misunderstood by the average reader." (*S.F. Bay Guardian, supra,* 17 Cal.App.4th at p. 660.)

Plaintiff doggedly attempts to distinguish *S.F. Bay Guardian* by pointing out all the differences between the March 27, 1991, Bay Guardian and the February 28, 1992, Rio Mirada: the absence of the words "parody" or April Fool in the school newspaper, the fact that the *Raider Final* was not published in a special section which had to be turned upside-down to be read, the absence of "mock articles and pictures" surrounding the *Raider Final,* and the fact that the *Raider Final* did not mimic any regular feature of the paper.[8] Focusing on the trees, plaintiff misses the forest. The court in *S.F. Bay Guardian* did not hold that a parody must blazon its identity with blatant visual cues in order for the average reader to recognize it as such, nor that it must mimic any feature regularly appearing in the same publication. The facts which determine whether the average reader would grasp the parodistic intent of a newspaper article necessarily differ from case to case and from newspaper to newspaper. The key point of *S.F. Bay Guardian* is that the answer depends on the full context in which the alleged libel appears. (17 Cal.App.4th at p. 659.)

Here, almost everything about the *Raider Final,* beginning with the introduction, would have revealed it to the average reader—i.e., a student or teacher at Rio Americano High School in the habit of reading the Rio Mirada—as a parody of a genre with which American high school students are all too familiar: the multiple-choice test. The combination of standard test-taking directions ("Proceed with caution and answer all questions with a number two pencil. You may begin . . . now."), mock-portentous warnings ("Welcome to hell," etc.), and information on the nonacademic character of the topic for testing ("your knowledge of Rio sub-cultures") would have alerted the average reader to the parodistic purpose of the *Raider Final* even

---

[8]Plaintiff also deems it significant that the title *Raider Final* had not appeared in any previous issue. However, several items of the *Raider Final* refer to a feature called the "Raider Quiz" which had evidently appeared previously, and also refer to the authors of the "Raider Quiz" as if those persons were the authors of the *Raider Final.* Because the record contains no samples of the "Raider Quiz," we cannot say whether its spirit was similar to that of the *Raider Final.*

before this reader went on to examine the questions. The questions and answers themselves (putting aside question 5 for the moment) are unremittingly facetious. Finally, the key to the scoring of the quiz presents the same sort of array of patently ludicrous choices as the answers to most of the questions. If all this were not enough, the placement of the feature on the "Entertainment" page of the paper and the distinctly unjournalistic nicknames appearing in the authors' bylines are cues to the nonserious character of the *Raider Final* nearly as gross as the upside-down printing of the April Fool insert in *S.F. Bay Guardian, supra.*

Since plaintiff, by his own admission, has never read any part of the *Raider Final* apart from question 5, his reaction to question 5 was not and is not based on a consideration of this material in its full context. (*S.F. Bay Guardian, supra,* 17 Cal.App.4th at p. 659.) Moreover, since he apparently never read any issue of the Rio Mirada before February 28, 1992, he cannot be deemed an "average reader" of that publication; thus his response to material appearing in the paper cannot be the gauge of how the average reader of the paper would understand the material, which is the test we must apply. (*Ibid.*)[9]

Anyone who could read question 5 in its full context and interpret its alternative answers as accusations of murder, drug dealing, and bullying would, if consistent, have to construe other parts of the *Raider Final* in a similarly literal way. For example, he would have to read answer (d) to question 6 as an accusation that Michael Jackson is "trisexual." He would also have to construe answers (a) and (b) to question 10 as factual assertions that on President's Day Abraham Lincoln "Streaked the lunchroom" at Rio Americano High School and George Washington "smoked a doobie in the sophomore john." In short, even if the nonfactual character of question 5 might have been "not so obvious" at first sight (*S.F. Bay Guardian, supra,* 17 Cal.App.4th at p. 660), the adjoining material should have "raise[d] reality questions" (*ibid.*) even for the most unsophisticated of readers. "Only a viewer that read only [question 5], accepted it at face value . . . , and looked at nothing else could miss the joke in this case, and that is not the average reader." (*Ibid.*) Whether the joke was good or bad, tasteful or tasteless, is irrelevant to the question whether it may be found libelous as a matter of law. (*Id.* at p. 662; see also *Pring* v. *Penthouse Intern., Ltd.* (10th Cir. 1982) 695 F.2d 438, 443.)

---

[9]Likewise, the allegation that at least one other person read question 5 in the same way as plaintiff is not sufficient to raise a triable issue of fact, because the viewpoint of the average reader cannot be determined "by taking a poll of readers[, but only] by considering the entire context in which the offending material appears." (*S.F. Bay Guardian, supra,* 17 Cal.App.4th at p. 660.)

The trial court properly granted summary judgment to defendant on plaintiff's libel cause of action.

## IV

Plaintiff lastly contends that the trial court denied him due process by sustaining demurrers to his causes of action for invasion of privacy and emotional distress before granting summary judgment on his libel cause of action. We disagree.

When claims for invasion of privacy and emotional distress are based on the same factual allegations as those of a simultaneous libel claim, they are superfluous and must be dismissed. (*Kapellas* v. *Kofman* (1969) 1 Cal.3d 20, 35, fn. 16 [81 Cal.Rptr. 360, 459 P.2d 912]; *Selleck* v. *Globe International, Inc.* (1985) 166 Cal.App.3d 1123, 1136 [212 Cal.Rptr. 838]; see also *McClatchy Newspapers, Inc.* v. *Superior Court* (1987) 189 Cal.App.3d 961, 965 [234 Cal.Rptr. 702].)

Here, plaintiff's claims for "false light" invasion of privacy and emotional distress incorporated all the factual allegations of his libel claim and added no further allegations. Relying on *Kapellas, supra,* and *Selleck, supra,* the trial court sustained defendant's demurrer to the emotional-distress cause of action without leave to amend, but granted plaintiff leave to amend the invasion-of-privacy cause of action so as to state a claim for public disclosure of private facts. Plaintiff concedes that he did not so amend his complaint because he could not have done so.

Plaintiff does not contend that *Kapellas* and *Selleck* are inapposite, nor does he cite any contrary authority. Instead, as best we can make out, he contends that due process required the trial court to determine *on demurrer* that the statements at issue in this case were reasonably capable of being understood as defamatory by an average reader as a matter of law, *before* deciding which causes of action (if any) should be dismissed. Absent authority for this proposal, which ignores the express holdings of *Kapellas* and *Selleck,* we see no reason to adopt it; indeed, given that *Kapellas* is a Supreme Court opinion, we have no power to do so. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)

## DISPOSITION

The judgment is affirmed.

Davis, J., and Morrison, J., concurred.