[No. B115437. Second Dist., Div. Four. Nov. 24, 1998.]

JUDA ALSZEH et al., Plaintiffs and Appellants, v.
HOME BOX OFFICE et al., Defendants and Respondents.

1458

---

COUNSEL

Perliss & Gross and Kenneth I. Gross for Plaintiffs and Appellants.

Troop, Steuber, Pasich, Reddick & Tobey, George T. Caplan, Harry A. Olivar, Jr., and Craig A. Kurland for Defendants and Respondents.

## OPINION

**CURRY, J.**—The trial court granted summary judgment in favor of respondents on appellants' claims of libel and invasion of privacy. We conclude that there is no triable issue about whether appellants were defamed, and therefore affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

The parties do not dispute the following facts: In the early 1990's, appellant Juda Alszeh operated a business named "J&J Imports" in partnership with Jacob Orgad, who is sometimes called "Cookie." After a year or two, the partnership dissolved. Orgad then operated a store under the name "J&J Beepers," and Alszeh began doing business as "J&J The King of Beepers."

Alszeh sells beepers, beeper services and cellular telephones through corporate appellants The King of Beepers—L.A., Inc., The King of Beepers—Orange, Inc., J&J The King of Beepers—Las Vegas, Inc., and J&J Beepers, Inc. He advertises his businesses by means of large billboards in which Alszeh is depicted wearing a king's robe and crown.

Respondents Nick Broomfield and his production company, Lafayette Film, Ltd., are the creators of a documentary film entitled HEIDI FLEISS: HOLLYWOOD MADAM (Paramount 1996). Respondent Home Box Office (hereafter HBO) broadcast the original version of the documentary in October 1995, and later distributed a version in which an image of one of Alszeh's billboards was "pixilated" or obscured. Respondent Canadian Broadcasting Corporation did not create, broadcast, or publish the documentary.

In December 1995, Alszeh sued HBO, alleging that it had defamed him by broadcasting the original version of the documentary, which identified him as an individual named " 'Cookie' Orgad," who is depicted as a person who may have inflicted harm on a number of people. On November 19, 1996, Alszeh and the corporate appellants filed their second amended complaint for libel, trade libel, and invasion of privacy. After the trial court sustained respondents' demurrer to the claim for trade libel without leave to amend, respondents sought summary judgment on the remaining claims. The trial court granted summary judgment, concluding that appellants were not defamed, appellants were limited purpose public figures, and respondents had not acted with actual malice. This appeal followed.

## DISCUSSION

Appellants contend that the trial court erred in granting summary judgment with respect to their claims for libel and invasion of privacy. We disagree.

### A. *Standard of Review*

██ "A motion for summary judgment is properly granted if the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) A defendant moving for summary judgment must show either that one or more essential elements of the plaintiff's cause of action cannot be separately established or that there is an affirmative defense which bars recovery. If the plaintiff fails to set forth specific facts showing a triable issue of material fact as to that cause of action or defense, summary judgment must be granted. (Code Civ. Proc., § 437c, subds. (n), (o)(2).) We independently review the parties' papers supporting and opposing the motion, using the same method of analysis as the trial court. [Citation.]

██ "Summary judgment is a favored remedy in defamation and invasion-of-privacy cases due to the chilling effect of protracted litigation on First Amendment rights. [Citation.] '[T]he courts impose more stringent burdens on one who opposes the motion and require a showing of high probability that the plaintiff will ultimately prevail in the case. In the absence of such showing, the courts are inclined to grant the motion and do not permit the case to proceed beyond the summary judgment stage.' [Citations.]" (*Couch v. San Juan Unified School Dist.* (1995) 33 Cal.App.4th 1491, 1498 [39 Cal.Rptr.2d 848], quoting *Sipple v. Chronicle Publishing Co.* (1984) 154 Cal.App.3d 1040, 1046 [201 Cal.Rptr. 665].)

### B. *Libel*

██ Appellants contend that there is a triable issue concerning whether respondents libeled Alszeh.[1]

Libel, a form of defamation (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 471, p. 557), "is a false and unprivileged publication by

---

[1]Because appellants limit their contentions on appeal to Alszeh's libel claim, they have waived all contentions with respect to the corporate appellants' libel claims. (*Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979 [21 Cal.Rptr.2d 834].)

writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." (Civ. Code, § 45.) ■ To determine whether a representation is libelous, "we look to what is explicitly stated as well as what insinuation and implication can be reasonably drawn from the communication. [Citation.] . . . In this connection the expression used as well as the 'whole scope and apparent object of the writer' must be considered. [Citation.]" (*Forsher* v. *Bugliosi* (1980) 26 Cal.3d 792, 803 [163 Cal.Rptr. 628, 608 P.2d 716], quoting *MacLeod* v. *Tribune Publishing Co.* (1959) 52 Cal.2d 536, 546 [343 P.2d 36].)

On summary judgment, "[w]hether published material is reasonably susceptible of an interpretation which implies a provably false assertion of fact—the dispositive question in a defamation action—is a question of law for the court. [Citations.] This question must be resolved by considering whether the reasonable or 'average' reader would so interpret the material. [Citations.] The 'average reader' is a reasonable member of the audience to which the material was originally addressed. [Citations.]" (*Couch* v. *San Juan Unified School Dist.*, *supra*, 33 Cal.App.4th at p. 1500.)

■ Here, the key issue is whether the documentary can reasonably be interpreted as identifying Alszeh with a person named "Cookie." Broomfield, who directed the documentary, provides narration and appears in the film. Viewed as a whole, the documentary chronicles Broomfield's inquiry into Heidi Fleiss's life. At the outset of the documentary, Broomfield arrives in Los Angeles in mid-1994, approximately one year after Fleiss had been charged with pandering, and informs the audience that he wants "to understand why someone from Heidi's privileged background would become a Madam." The remainder of the film depicts in chronological order Broomfield's encounters with Fleiss and some of her acquaintances.

The pertinent part of the documentary begins when Broomfield notices several bullet holes in the ceiling of a residence owned by Ivan Nagy, who tells Broomfield that a person named Cookie was responsible for them. Nagy further alleges that Cookie worked for Fleiss as "an enforcer or procurer," and that he "operates" a beeper store called "J&J Beep" in Hollywood.

Broomfield visits this store and asks a clerk for Cookie. After the clerk denies any knowledge of Cookie, Broomfield says, "Oh, because I was told that he normally works here. What about Asoff? He doesn't either? I must have a lot of bad information." The clerk responds, "Really bad," and denies having ever heard of Cookie.

Broomfield searches for more information about Cookie, and tells the viewer that "[i]t was really hard to find out anything about Cookie." He then refers to a newspaper report about a college student dying of a drug overdose that mentions Cookie. The viewer is presented with the text of the report in which the name "Cookie Orgad" is prominently displayed. Broomfield next interviews a woman about Cookie, who displays distress at the mention of Cookie's name but refuses to discuss him.

Immediately following this interview, Broomfield is shown driving down a street in Los Angeles. The camera focuses on one of Alszeh's billboards, which displays the title "J&J King of Beepers" and Alszeh wearing a king's crown and robes. Over this image, Broomfield says, "I noticed this billboard when driving back through downtown LA after attending Heidi's trial one day. With Cookie on my mind, I imagined I saw him everywhere." As Broomfield finishes these remarks, the camera focuses briefly on Alszeh's face.

Shortly thereafter, Broomfield is shown interviewing a second woman, who alleges that Cookie beat her. Broomfield also obtains from Fleiss a recorded phone conversation ostensibly between Nagy and Cookie. The conversation, which is played while the viewer sees recreated but unrecognizable faces, depicts Cookie as urging Nagy to make up his mind about Fleiss, and to harm her if he so decides.

Broomfield then returns to J&J Beeper "on the off chance of finding Cookie." A clerk named Jack identifies Cookie as his cousin. Broomfield explains that he wants to ask Cookie a question, and that "Asoff said he'd try and get us in touch with him." The clerk speaks to someone on the phone and then tells Broomfield, "He's not interested."

Broomfield's search for Cookie ends when he tries reaching Cookie by beeper. A man answering to "Cookie" responds, but declines in profane terms to tell Broomfield whether he shot holes in Nagy's ceiling. As the scene ends, Broomfield, speaking in voice-over narration, says, "J&J Beepers denies that Cookie owned the company, but says he was once an employee."

We find dispositive guidance on whether the documentary defames Alszeh in *Forsher* v. *Bugliosi, supra,* 26 Cal.3d 792, which concerned Vincent Bugliosi's book Helter-Skelter: The True Story of the Manson Murders (1974), the depiction of his prosecution of criminal charges against Charles

Manson and his associates. (26 Cal.3d at pp. 795-796.) In Helter-Skelter, Bugliosi described the possible murder of attorney Ronald Hughes, then representing one of Manson's associates, who disappeared during a camping trip after traveling with James Forsher and Lauren Elder. (*Id.* at pp. 796-797.) Later in the book, Bugliosi discussed subsequent deaths that may have been due to Manson's associates, including those of James and Lauren Willett. (*Id.* at pp. 799-801.) Noting that individuals named "James" and "Lauren" were involved in both incidents, Bugliosi speculated that Manson's associates had killed the Willetts because they were Forsher and Elder and knew too much about Hughes's death. (*Id.* at pp. 800-801.) He decided that it was unlikely that Forsher and Willett were the same man, citing apparent age differences, but speculated that Lauren Elder was Lauren Willett. (*Id.* at pp. 801-802.)

Forsher brought a defamation action against Bugliosi, alleging that Helter-Skelter implied that he had participated in Hughes's disappearance or death. (*Forsher* v. *Bugliosi, supra,* 26 Cal.3d at p. 802.) Our Supreme Court concluded that a reasonable reader of Helter-Skelter would not draw this inference, reasoning that although Helter-Skelter raised the possibility that Willett was Forsher, Bugliosi expressly indicated that this was unlikely, and the book, taken as a whole, did not reasonably support the inference. (*Id.* at pp. 804-807.)

Here, as in *Forsher*, the documentary raises the possibility that two people are the same, but the documentary, taken as a whole, does not support the reasonable inference that the individuals are identical. The documentary is structured as a chronicle of discovery, and generally speaking, in any given scene Broomfield is not represented as then having material knowledge that he denies the viewer. Thus, when Broomfield's view of Alszeh's billboard triggers Broomfield's reflection that he *"imagined* [he] saw [Cookie] *everywhere"* (italics added), a viewer could reasonably infer that Broomfield is speculating that, given what he then knows, virtually anyone associated with J&J Beepers might be Cookie, but *not* that Broomfield is insinuating that Alszeh is Cookie. Any suggestion that Broomfield might be able to identify Cookie by sight is undermined by the events portrayed in the documentary. Broomfield states that he can find little information about Cookie, and he repeatedly fails to meet Cookie.

Moreover, as in *Forsher*, the only reasonable inference raised by the information that Broomfield develops is that Cookie is neither the owner nor a present employee of J&J Beepers. Although Nagy says that Cookie operates J&J Beepers, Nagy is portrayed throughout the documentary as a

questionable source of information. Furthermore, a clerk at the store denies knowing anyone named Cookie, another says only that Cookie is his cousin, and Broomfield reports that J&J Beepers denied that Cookie owns the store or presently works at it. Broomfield refers to someone with the name "Asoff," which resembles "Alszeh," but he distinguishes Asoff from Cookie by remarking that Asoff had tried to put him in contact with Cookie. In view of these facts, even a reasonable viewer who had confused J&J Beepers with one of Alszeh's stores would not infer that the secretive Cookie with an apparently limited connection to J&J Beepers is nonetheless the person who displays himself on large billboards as "J&J King of Beepers."

Appellants cite several cases in support of their contention that the documentary defames Alszeh, but none of these cases is factually similar to the circumstances before us. (*Morningstar, Inc.* v. *Superior Court* (1994) 23 Cal.App.4th 676, 686-697 [29 Cal.Rptr.2d 547] [mutual fund fails to state claim for defamation when its complaint alleges that published article critical of mutual fund's advertisements is defamatory]; *Selleck* v. *Globe International, Inc.* (1985) 166 Cal.App.3d 1123, 1130-1133 [212 Cal.Rptr. 838] [actor's father states claim for defamation when his complaint alleges that publication falsely advertises that father revealed secrets about actor]; *Cameron* v. *Wernick* (1967) 251 Cal.App.2d 890, 891-895 [60 Cal.Rptr. 102] [author states claim for defamation when his complaint alleges that publication falsely reported that author wrote book to make "a fast buck"].)[2]

Summary judgment on Alszeh's claim for defamation was therefore proper.[3]

## C. *Invasion of Privacy*

 When, as here, an invasion of privacy claim rests on the same allegations as a claim for defamation, the former cannot be maintained as a separate claim if the latter fails as a matter of law. (*Reader's Digest Assn.* v. *Superior Court* (1984) 37 Cal.3d 244, 265 [208 Cal.Rptr. 137, 690 P.2d 610].) Accordingly, summary judgment on Alszeh's claim for invasion of privacy was also proper.

[2]Appellants also contend that Broomfield conceded in interrogatory responses that a reasonable person might infer that Alszeh was Cookie. We are not persuaded. In the interrogatory responses, Broomfield expressly states that the documentary does not suggest that Alszeh and Cookie are the same person, but concedes that a reasonable person aware of some facts not depicted in the documentary might infer that they are identical.

[3]In view of our conclusion that the documentary does not defame Alszeh, it is not necessary to address his contentions as to whether he is a limited purpose public figure. (*Couch* v. *San Juan Unified School Dist.*, *supra*, 33 Cal.App.4th at pp. 1500-1504.)

## DISPOSITION

The judgment is affirmed.

Vogel (C. S.), P. J., and Hastings, J., concurred.

Appellants' petitions for review by the Supreme Court was denied February 17, 1999.