Filed 9/30/13  TRG Motorsports v. The Media Barons CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| TRG MOTORSPORTS, LLC, et al., | B244937 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC477200) |
| v. | |
| THE MEDIA BARONS, LLC, et al., | |
| Defendants and Respondents. | |

APPEAL from an order of the Superior Court of Los Angeles County. Steven J. Kleifield, Judge.  Affirmed.

Eagan Avenatti and Michael J. Avenatti for Plaintiffs and Appellants.

Grodsky & Olecki, Allen B. Grodsky, Zachary Rothenberg for Defendants and Respondents.

_____

A member of a company that appellants relied on for marketing and technical support surreptitiously created a publicly accessible website that mocked appellants through the use of thinly disguised pseudonyms and outrageous content. After appellants discovered who created the website, they sued the individual and the company for libel. The trial court found the action to be a Strategic Lawsuit Against Public Participation (SLAPP) (Code Civ. Proc., § 425.16)[1] and struck appellants' complaint.

Reviewing the matter de novo, we determine that the action arose from protected activity and that appellants failed to establish a reasonable probability of prevailing on the merits of their claim. Accordingly, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

**The Complaint**

In January 2012, appellants TRG Motorsports, LLC (TRG Motorsports), The Racers Group, Inc. (Racers Group), Buckler Family Vineyards, LLC, doing business as Adobe Road (Adobe Road), and Kevin Buckler filed a complaint for libel against The Media Barons, LLC (Media Barons), and Jason Medbury. According to the complaint, TRG Motorsports is a North Carolina limited liability company that "owns and operates race cars which compete at the highest and most competitive levels of racing." Racers Group is a California corporation that is "known within the sports car racing world both by its corporate name and its acronym, 'TRG.'" It "owns and operates Porsche sports cars . . . and is one of the only organizations to win both the 24 Hours of Daytona and 24 Hours of LeMans automobile races, which are among the most prestigious sports car races in the world." Adobe Road produces California wines and operates a vineyard and tasting house in the Sonoma Valley. Buckler is the chief executive officer of TRG Motorsports, Racers Group, and Adobe Road.

---

[1] All further references to statutes are to the Code of Civil Procedure unless otherwise stated.

Respondent Media Barons is a marketing services and technical support company that works extensively with the auto racing industry. Respondent Medbury works for Media Barons in marketing and internet technology services.

Appellants alleged that in May 2011 Buckler became aware of an internet website that could be found at http://www.genericraceteam.com, among other internet addresses (the website). He also became aware of a Facebook page entitled "GRT (Generic Race Team)" and the Twitter account "@GenericRaceTeam," both of which directed viewers to the website. The website closely resembled Racers Group's own site. The logo "GRT," along the top of the website's pages, was almost identical in design to Racers Group's own "TRG" logo. The website contained numerous pages of what looked to be articles, information, and press releases regarding the GRT "team" and a winery called "Terra Cotta Path" (instead of Adobe Road). The website stated that the "owner" of GRT and Terra Cotta Path was a man named "Devin Fuckler," an obvious play on the name Kevin Buckler. A picture of "Fuckler" on the website showed him to have a ridiculous 1980's-era mullet haircut and a grossly enlarged forehead.

One of the purported articles on the website concerned GRT's suspended "plans" to open a race shop in Abbotabad, Pakistan. Left unsaid was that Abbotabad was the site of the May 2011 Navy Seal raid on Osama Bin Laden. The website also contained supposed information on Terra Cotta Path, including that it had "won several local contests," "received mention in local newspapers," and that "the team even samples wine in the exact same place our race cars are serviced." The website further claimed that GRT was founded "by team owner Devin Fuckler, who has managed great success in spite of his little person status[.] [T]he team is founded on equal parts passion and his father's trust fund." The complaint noted that the website had received attention on internet message boards, where numerous people commented on the preposterous content.

Appellants' complaint further alleged that the website was registered anonymously, making it impossible to quickly determine who was responsible for its creation. Buckler contacted Media Barons, appellants' long-time technical and marketing

3

support vendor, to see if it could help determine who was responsible. Medbury responded to Buckler's request by e-mail and discouraged him from pursuing his investigation. Medbury stated that it could take criminal "hacking" actions to determine the originator of the website, and "'the risk seems to be too great just to try to catch someone writing an [sic] retarded website.'" Nevertheless, Buckler pursued his investigation and eventually discovered that Medbury himself created the offensive website as well as the Facebook and Twitter accounts.

**The Anti-SLAPP Motion**

Soon after appellants filed their complaint, respondents filed an anti-SLAPP motion, arguing that the website and related materials were statements made in a public forum concerning an issue of public interest, and that appellants' libel claims were nonactionable because they targeted a work of parody. Along with the anti-SLAPP motion, respondents submitted the declaration of Sean Hackman, a principal of Media Barons. Heckman declared that, by virtue of his work in the "auto racing and motorsports industry," he was knowledgeable about the industry. Heckman stated that TRG Motorsports and Racers Group are two of the biggest names in the motorsports world, and that both enthusiasts and casual racing fans are familiar with the companies. According to Heckman, Buckler is "the face" of the companies, and is a "household name" among racing fans.

Attached to Heckman's declaration was a collection of media materials covering appellants. Heckman attached a list of website addresses containing videos of Buckler appearing on Speed (a television channel devoted to auto racing), Fox News, Fox Radio, and local television. Also attached were articles appearing in such publications as Wine Spectator, USA Today, Forbes, and the Sporting News.

In opposition, appellants asserted that the website did not constitute a matter of public interest. They further argued that the website was defamatory because it impliedly asserted that Buckler is incompetent and unethical and that the companies he owns are poorly run. Buckler submitted a declaration in which he recounted how he discovered that Medbury was responsible for the website. He further explained his belief that the

4

website attacked the quality of the wine produced by Adobe Road, disparaged his hard work in building the appellant companies, and insinuated that he and his companies had no respect for their corporate sponsors.

The trial court issued its ruling granting the anti-SLAPP motion in September 2012. The court found that the issue of whether Buckler is capable of running prominent racing teams is a matter of public interest, and that appellants are "internationally known figures in the racing community." The court further found that the website was "clearly a joke, parody, and/or satire," and that no reasonable reader would interpret the statements contained on the website as stating actual facts.

Appellants timely appealed.

## DISCUSSION

The anti-SLAPP statute allows the courts to expeditiously dismiss "'a meritless suit filed primarily to chill the defendant's exercise of First Amendment rights.'" (*Paulus v. Bob Lynch Ford, Inc.* (2006) 139 Cal.App.4th 659, 670; *Simpson Strong-Tie, Co., Inc. v. Gore* (2010) 49 Cal.4th 12, 21) The statute is "construed broadly" so as to "encourage participation in matters of public significance" and to prevent participation from being "chilled through abuse of the judicial process." (§ 425.16, subd. (a).)

There are two steps to a motion to strike brought under section 425.16. First, the defendant must make a threshold showing that the challenged cause of action is one arising from protected activity. (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67.) Second, if the lawsuit does arise from protected activity, the plaintiff must establish a reasonable probability that he or she will prevail on the merits of the claims. (§ 425.16, subd. (b)(1); *City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 76; *Zamos v. Stroud* (2004) 32 Cal.4th 958, 965.)

We review an order granting an anti-SLAPP motion de novo. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 325.)

## I. The First Step

In deciding whether claims arise from protected activity, we review the pleadings as well as the evidence presented by the parties on the anti-SLAPP motion. (§ 425.16,

subd. (b)(2); *Coretronic Corp. v. Cozen O'Connor* (2011) 192 Cal.App.4th 1381, 1389.) "In the anti-SLAPP context, the critical point is whether the plaintiff's cause of action itself was *based on* an act in furtherance of the defendant's right of petition or free speech." (*City of Cotati v. Cashman*, *supra*, 29 Cal.4th at p. 78.) The motive of the defendant in undertaking the challenged activities is irrelevant. (*People ex rel. Fire Ins. Exchange v. Anapol* (2012) 211 Cal.App.4th 809, 822.)

A defendant need only make a prima facie showing that the plaintiff's claims arise from protected activity. (*Mundy v. Lenc* (2012) 203 Cal.App.4th 1401, 1408; *People ex rel. Fire Ins. Exchange v. Anapol*, *supra*, 211 Cal.App.4th 809, 822; *Coretronic Corp. v. Cozen O'Connor*, *supra*, 192 Cal.App.4th at p. 1388.) "The Legislature did not intend that in order to invoke the special motion to strike the defendant must first establish her actions are constitutionally protected under the First Amendment as a matter of law." (*Fox Searchlight Pictures, Inc. v. Paladino* (2001) 89 Cal.App.4th 294, 305.) "Instead, under the statutory scheme, a court must generally presume the validity of the claimed constitutional right in the first step of the anti-SLAPP analysis, and then permit the parties to address the issue in the second step of the analysis, if necessary. [Citation.] Otherwise, the second step would become superfluous in almost every case, resulting in an improper shifting of the burdens." (*Chavez v. Mendoza* (2001) 94 Cal.App.4th 1083, 1089; *City of Los Angeles v. Animal Defense League* (2006) 135 Cal.App.4th 606, 621.)

Respondents contend that the website was a "written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest." (§ 425.16, subd. (e)(3).) Appellants acknowledge that the activity at issue was in a "public forum." It is well established that websites accessible to the public are "public forums." (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 41, fn. 4; *Kronemyer v. Internet Movie Database Inc.* (2007) 150 Cal.App.4th 941, 950; *Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 895.) The issue to decide is whether respondents made a prima facie showing that the challenged statements were made "in connection with an issue of public interest."

6

The term "issue of public interest" is construed broadly in the anti-SLAPP context. (*Hecimovich v. Encinal School Parent Teacher Organization* (2012) 203 Cal.App.4th 450, 464.) An issue of public interest is "*any issue in which the public is interested.*" (*Nygård, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1042.) The issue does not need to be "significant" to be covered by the anti-SLAPP statute. (*Ibid*.) For example, in *Hecimovich*, it was found that a dispute between a fourth grade basketball coach and members of a parent teacher organization regarding parental complaints about the plaintiff's abrasive coaching style constituted an issue of public interest because "the safety of children in sports" is an issue of public interest, the "suitability of [the plaintiff's] coaching style was a matter of public interest among the parents," and "problem coaches/problem parents in youth sports" is an issue of public interest. (203 Cal.App.4th at pp. 467-468.)

Applying the relevant law to the anti-SLAPP motion at issue here, we find that respondents made a prima facie showing that the website was a statement made in a public forum in connection with an issue of public interest. Appellants' own complaint highlights the prominence of TRG Motorsports and Racers Group in the auto racing world. The complaint notes that TRG Motorsports' race cars "compete at the highest and most competitive levels of racing," and Racers Group "is one of the only organizations to win both the 24 Hours of Daytona and 24 Hours of LeMans automobile races, which are among the most prestigious sports car races in the world." Without question, statements about highly accomplished teams in auto racing—an extraordinarily popular spectator sport in the United States and other parts of the world—concern matters of public interest.

We further find that the website's inclusion of commentary relating to Buckler (in the form of phony stories about "Devin Fuckler") did not render the website a mere expression of a private dispute. Respondents submitted substantial evidence that Buckler is a well-known figure in the auto racing world and publicly promotes his businesses along with himself. """"[T]here is a public interest which attaches to people who, by their accomplishments, mode of living, professional standing or calling, create a legitimate and

7

widespread attention to their activities.""" (*Stewart v. Rolling Stone LLC* (2010) 181 Cal.App.4th 664, 667-668 [applying principle to "indie rock" musicians].) In *Seelig v. Infinity Broadcasting Corp.* (2002) 97 Cal.App.4th 798, 808 (*Seelig*), it was found that the plaintiff, one of 50 contestants in the television program *Who Wants to Marry a Multimillionaire*, "voluntarily subjected herself to inevitable scrutiny and potential ridicule by the public and the media" by briefly appearing on the program. Respondents here submitted evidence that Buckler frequently appeared on television and in print media to discuss auto racing and Adobe Road wine. By seeking out and making these public appearances, and by choosing to compete in a popular spectator sport, Buckler invited public scrutiny.[2]

Moreover, respondents submitted evidence sufficient to show that—because of Adobe Road's integrated relationship with TRG Motorsports and Racers Group—the website's statements vaguely alluding to Adobe Road (using the fake name "Terra Cotta Path") were protected by the anti-SLAPP statute. Adobe Road promotional materials, attached as an exhibit in support of the anti-SLAPP motion, stated: "Adobe Road has played an integral role in the marketing and promotion of TRG's racing teams, relationship building and hospitality events. . . . At most races, Adobe Road hosts tastings, wine-maker dinners and tours in conjunction with race events. . . . Adobe Road plays an important role in the marketing, promotion and execution of TRG's sponsor activities." Further, an article in Wine Spectator magazine, also attached as an exhibit, noted that Buckler made Adobe Road the primary sponsor of a Racers Group car. Because Adobe Road was promoted as an important component of Buckler's motorsports

---

[2]    *D.C. v. R.R.* (2010) 182 Cal.App.4th 1190, a case relied on by appellants, is distinguishable. First, the court in that case found that that the statement at issue was a threat, which was not entitled to First Amendment protection under the anti-SLAPP statute. (*Id.* at pp. 1218, 1223-1226.) Second, the defendants did not offer any evidence to show that the plaintiff was known to the public or in the public eye. (*Id.* at p. 1229.) Neither of these conditions is present here.

operations, statements made concerning the auto racing teams could be expected to contain references to Adobe Road.

In sum, the website parodied appellants' organization and promotional style. The evidence shows that appellants are all prominent members of the organization, and the organization is well known in the auto racing world. Respondents therefore made a prima facie showing that the website was a public forum and was made in connection with an issue of public interest.

## II. **The Second Step**

Once the first prong of an anti-SLAPP motion is satisfied, the burden shifts to the party asserting the cause of action to establish a probability of prevailing. (*HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204, 213.) If the claim stated in the complaint is supported by sufficient prima facie evidence, it is not subject to being stricken as a SLAPP. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 93.) An anti-SLAPP motion should be granted, however, if the defendant's evidence in support of the motion defeats the plaintiff's attempt to establish evidentiary support for the claim, as a matter of law. (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal. 4th 811, 821.)

Appellants contend that they established a reasonable probability that they would prevail on their libel claim. They assert that the trial court erred by finding that statements contained on the website were not provably false assertions of fact and by finding that the website was a parody.

"Whether published material is reasonably susceptible of an interpretation which implies a provably false assertion of fact—the dispositive question in a defamation action—is a question of law for the court." (*Couch v. San Juan Unified School Dist.* (1995) 33 Cal.App.4th 1491, 1500.) The question is to be resolved by determining how the "'average' reader" would interpret the material (*ibid.*; *San Francisco Bay Guardian, Inc. v. Superior Court* (1993) 17 Cal.App.4th 655, 658-659 (*S.F. Bay Guardian*)) and by considering the """"totality of the circumstances"""" (*Seelig*, *supra*, 97 Cal.App.4th at p. 809). "Statements do not imply a provably false factual assertion and thus cannot form the basis of a defamation action if they cannot '"reasonably [be] interpreted as stating

9

actual facts" about an individual.' [Citations.] Thus, 'rhetorical hyperbole,' 'vigorous epithet[s],' 'lusty and imaginative expression[s] of . . . contempt,' and language used 'in a loose, figurative sense' have all been accorded constitutional protection. [Citations.]" (*Ferlauto v. Hamsher* (1999) 74 Cal.App.4th 1394, 1401; *Seelig*, *supra*, 97 Cal.App.4th at p. 809.) Furthermore, although humor or parody may in certain circumstances convey a defamatory meaning, if the average reader would have understood statements to be a mere joke or parody, not intended to convey an assertion of fact, then a libel claim will not lie. (*Polygram Records, Inc. v. Superior Court* (1985) 170 Cal.App.3d 543, 553-554; *Couch v. San Juan Unified School Dist.*, *supra*, 33 Cal.App.4th at pp. 1500-1501; *S.F. Bay Guardian*, *supra*, 17 Cal.App.4th at p. 661-662.)

The website and related materials at issue here were clearly parody. Nothing on the website provided the average reader any reason to suspect that it conveyed actual facts. Emblazoned atop the home page of the website was a story dated May 1, 2011, headlined "Sam Standeround Named GRT Employee of the Year, 2011!!" The intended humor was obvious—a person who "stands around" was named employee of the year before the year was even halfway over. A picture of the purported Mr. Standeround showed him to be a portly man with a curly mullet haircut, cradling a delicate poodle-type dog. Farther down the home page was pictured the "crew chief of the week," a crazed-looking man with his extraordinarily large mouth agape exhibiting his almost complete lack of teeth. Other stories on the website included one on how "Fuckler" crossed paths with a famous race car driver when the two purchased "string cheese" at the Long Beach Airport "dairy kiosk," and another on how Fuckler invested in a "cutting edge, next generation, state-of-the-art rural animal waste disposal company" called "Rump Dump Round Up."

Appellants focus on a few statements from the website that they claim were defamatory. We find that these statements were not actionable, particularly when one considers that they appeared on a website filled with absurd commentary. The comment that "the team samples wine in the exact same place our race cars are serviced" did not defame Adobe Road, as appellants assert. Even if the team really were to sample wine

10

where cars were serviced, such a fact would not lead to the conclusion that the wine was of low quality or grade. Moreover, other references to Terra Cotta Path, including that it was "voted 'wine' at a local culinary festival," made plain the satire.

Appellants also take issue with the website's statement that GRT was founded "by team owner Devin Fuckler, who has managed great success in spite of his little person status[.] [T]he team is founded on equal parts passion and his father's trust fund." Again, the parody in this statement was apparent. No reasonable businessman would claim a false "little person status"[3] or boast of his reliance on his father's trust fund. When viewed in the context of the many other ridiculous statements about "Devin Fuckler," the satirical nature of the phony Fuckler biographical statement becomes even more obvious.

Appellants further argue that they were defamed by the website's inclusion of a fake sponsor, "Xtreme Super Awesome Eco Boost." According to the (poorly digitally manipulated) picture of Xtreme Super Awesome Eco Boost, it comes with a pair of human testicles attached to the bottle. An average viewer of the website would not believe that Xtreme Super Awesome Eco Boost is a real product. Neither would the viewer interpret the fake advertisement as a statement that appellants promote pornography or have no respect for the name and identity of their corporate sponsors, as appellants contend. Instead, the average viewer would interpret the statement as a sophomoric attempt at humor.[4]

Overall, the fake website created by Medbury was mean-spirited, offensive, and stupid. But it did not provide grounds for a legitimate libel claim. As was held in *S.F.*

---

[3] The evidence shows that Buckler may be somewhat short, but he is certainly not a "little person."

[4] Indeed, respondents presented evidence that viewers of the website did consider it a joke. Respondents submitted printouts of an internet discussion forum for racing enthusiasts where members commented on the website. Comments included: "Quite funny"; "WOW hahahaha[;] somebody has WAY too much time on their hands"; and "That is hilarious."

11

*Bay Guardian*, a case involving a fake letter-to-the-editor published in a parody edition of a newspaper, "[i]f a parody could be actionable because, while recognizable as a joke, it conveyed an unfavorable impression, very few journalistic parodies could survive. The butt of the parody is chosen for some recognizable characteristic or viewpoint which is then exaggerated. It is not for the court to evaluate the parody as to whether it went 'too far.' As long as it is recognizable to the average reader as a joke, it must be protected or the rather common parody issues of newspapers and magazines must cease to exist." (17 Cal.App.4th at p. 662.) Since the average viewer would have recognized that the website was nothing more than a parody, it was not actionable as libel.

## DISPOSITION

The order granting the anti-SLAPP motion is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:


ASHMANN-GERST, J.


FERNS, J.*

_____

\*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.