[No. A061110. First Dist., Div. Four. July 29, 1993.]

SAN FRANCISCO BAY GUARDIAN, INC, et al., Petitioners, v.
THE SUPERIOR COURT OF THE CITY AND COUNTY OF SAN
FRANCISCO, Respondent;
ADAM SPARKS, Real Party in Interest.

**COUNSEL**

Kay & Merkle, Douglas A. Marshall, Crosby, Heafey, Roach & May, John E. Carne, Joseph P. Mascovich and Thomas R. Burke for Petitioners.

No appearance for Respondent.

Grayson & Topsfield and Violet Elizabeth Grayson for Real Party in Interest.

## OPINION

PERLEY, J.—The San Francisco Bay Guardian, Inc., and Bruce B. Brugmann, the Bay Guardian's publisher (petitioners), seek a writ to require respondent court to grant their motion for summary judgment. We issue the writ for the reasons explained below.

### FACTS

In the March 27, 1991, issue of the paper, the Bay Guardian included a parody of itself lampooning various issues, public officials and private parties. The following copy was included as a letter to the editor:

"Rent control

"I don't understand why Vince Bielski is so upset about electroshock therapy. I find that my tenants who have undergone this treatment are much more cooperative.

"Adam Sparks
"San Francisco"

On March 19, 1992, real party filed a complaint for damages against petitioners based upon the fact that he did not write the above letter. The complaint sets forth causes of action for libel, invasion of privacy, false light and infliction of emotional distress.

On December 31, 1992, petitioners moved for summary judgment on the ground that each cause of action is barred by the First Amendment of the United States Constitution. Petitioners contended that real party is a local public figure in the matter of his ownership and operation of a residential hotel. They contended that the parody section of the paper was an obvious April Fool's joke which could not be taken as fact. They attached to their motion a complete copy of the issue of March 27, 1991, and copies of numerous news releases regarding real party's legal battles to rent to tourists in the face of the City's efforts to limit his right to do so by enforcement of a Residential Hotel Ordinance.

Real party opposed the motion. He contended that the letter was not understood as parody by the average reader and to support that contention attached declarations of five people who stated they read the letter and did not recognize it as part of a parody.[1] Furthermore, he contended that, even if the letter was recognized as a joke, it would be actionable since humor can give rise to actions for defamation. Real party contended that he was not a public figure but that, even if he were, the actions of petitioners were malicious in that the letter was published with knowledge that it was false.

The motion for summary judgment was denied in an order filed March 23, 1993. The order states that there is a triable issue of fact as to whether the published statements are protected as parody. The issue to which the court referred was the dispute as to whether the average reader would have recognized the letter as a joke. The court considered as evidence on this point the declarations submitted by real party from persons who had not understood that the letter was part of a parody.

## ANALYSIS

The relevance of whether the average reader would have recognized the letter as a joke is illustrated by the cases of *Baker* v. *Los Angeles Herald Examiner* (1986) 42 Cal.3d 254 [228 Cal.Rptr. 206, 721 P.2d 87] and *Polygram Records, Inc.* v. *Superior Court* (1985) 170 Cal.App.3d 543 [216 Cal.Rptr. 252].

In *Baker,* the producer of a television documentary on sex education brought a defamation action against a newspaper and its television critic based on the critic's statement in a review of the documentary that "My impression is that [the producer] . . : told his writer/producer . . . 'We've got a hot potato here—let's pour on titillating innuendo and as much bare flesh as we can get away with. Viewers will eat it up.' " The Supreme Court agreed with the trial court which had sustained a general demurrer on the ground that the average reader of the review could not have reasonably understood the statement to be one of fact. The court applied the "totality of the circumstances" test to determine the view of the average reader. These circumstances included the specific statement complained of and the language prefatory to the statement, the entire article in which it appeared and the type of journalistic endeavor.

---

[1] These declarations were by (1) Robert Borelli, real party's accountant; (2) Robert Dorenstreich, a fellow member of a trade club; (3) Violet Elizabeth Grayson, real party's attorney; (4) Gunter Copp, acquaintance of real party and an owner of a number of residential properties in the Tenderloin; and (5) David Kimmel, a real estate investor and co-owner of several apartment buildings with real party.

In *Polygram Records*, a wine distributor brought an action for trade libel and defamation against a comedian and various media for publishing in a comedy routine allegedly disparaging remarks about the seller's wine. The trial court overruled defendants' demurrer and the Court of Appeal reversed by issuance of a writ of mandate. The reviewing court looked at the total context of the jest about the wine to determine whether "any sensible person" would take the joke seriously.

Real party contends that it is for the jury to decide how the average reader understood the publication in question, citing *Weller* v. *American Broadcasting Companies, Inc.* (1991) 232 Cal.App.3d 991, 1003 [283 Cal.Rptr. 644]. However, *Weller* accepts the proposition that it is for the court to decide in the first instance whether the statements in a publication "would reasonably be understood as assertions of fact as opposed to hyperbole, or loose figurative expression." (*Id.* at p. 1002, fn. 9.) In the case before it, the court concluded that the statements were ambiguous and found no error in permitting the statements to be submitted to the jury for their evaluation. (See also *Masson* v. *New Yorker Magazine, Inc.* (1991) 501 U.S. __, __ [115 L.Ed.2d 447, 470, 111 S.Ct. 2419] where "the work . . . provides the reader no clue that the quotations are being used as a rhetorical device . . . ." thus producing a jury question as to the view of "the reasonable reader.")

In the instant case, there is no dispute that the offending letter was included in a parody of the Bay Guardian which was itself offered as an "April Fool's" joke. The question of whether the average reader would have recognized the issue as a parody and the letter as a part of the joke depends upon a view of the entire issue, i.e., the "totality of circum- The entire issue of the paper of March 27, 1991, was before the court on the motion for summary judgment, and it was for the trial court in the first instance to determine whether the question could be decided as a matter of law. It is now for this court to make its own independent determination of this question. (*Chevron U.S.A., Inc.* v. *Superior Court* (1992) 4 Cal.App.4th 544, 548 [5 Cal.Rptr.2d 674].)

Review of the full context in which the fake letter appeared leads us to conclude that the average reader, as a matter of law, would recognize that the letter was a part of the parody and not actually written by real party. The issue of the Bay Guardian in which the parody appeared began with the regular edition. The table of contents informed readers under the heading "April Fool!" that the edition contained a "special parody section." The parody section commenced at the back of the regular edition and, if the paper were picked up as presented, could only be read by turning the paper

upside down. The parody section aped the format of the regular section and commenced with a large picture of the Bay Guardian publisher in an attitude and on an issue at odds with the usual editorial stance of the Bay Guardian. The parody portion continued with mock articles and pictures, some of which are recognizable as jokes at first glance. For example, a picture purported to show Supervisor Bill Maher being restrained by armed men during a board of supervisor's meeting because he became enraged when a fellow supervisor informed him it was raining. An article reports that "an unsuccessful candidate for supervisor, has decided to undergo a sex-change operation . . . and will change his name [to a female office holder] to enter the 1991 mayor's race. . . ." On the page containing the letters to the editor, some of the material is not so obvious. However, perusal of the letters would raise reality questions and would lead into the announcement that the Bay Guardian welcomes letters and the information that "Copies of all unsigned letters will be sent to the Federal Bureau of Investigation for cross-checking. In case of accident, we will notify next of kin."

Real party emphasizes that a reader might not notice anything odd at first looking at the "April Fool's section" and might not look far enough to understand the joke. However, the very nature of parody and of April Fool's jokes is to catch the reader off guard at first glance, after which the "victim" recognizes that the joke is on him to the extent that it caught him unaware. The instant "April Fool's section" is not subtle. Only a viewer that read only the fake letter, accepted it at face value despite its unusual message, and looked at nothing else could miss the joke in this case, and that is not the average reader. Applying the "totality of the circumstances," we conclude, as a matter of law, that the average reader would recognize the letter as a fake and a joke.

The fact that real party furnished declarations of a few people who stated that they did not recognize the letter as a joke does not raise a question of fact as to the view of the average reader. The question is not one that is to be answered by taking a poll of readers but is to be answered by considering the entire context in which the offending material appears. Thus, in *Polygram Records*, the court noted that the plaintiff had suggested that the complaint could be amended to present facts showing that some persons understood the joke to refer to plaintiff's products. The court rejected the idea that such an amendment would serve any purpose in view of its conclusion that, as a matter of law, the total comedy routine revealed that the communication, even if understood to refer to plaintiff's wine, could not be taken seriously. In the instant case, the April Fool's section of the paper was obviously and unambiguously a parody of the regular edition which could not be misunderstood by the average reader.

Because the average reader would recognize the April Fool's issue as a parody, the letter does not defame real party by false attribution or presentation of false facts. Real party, however, contends that even if the letter were recognized as a parody, it would be defamatory because it would convey the implication that real party was an unscrupulous landlord and an insensitive human being. This does not distinguish the case from *Polygram Records* on which real party relies for the proposition that humor is not "a form of expression that is *categorically* protected by the First Amendment." (170 Cal.App.3d at p. 552.) In exploring that proposition, which had been advanced by petitioners in the case before it, the *Polygram* court remarked: "[C]aricature, satire or other forms of humor which ridicule may in certain circumstances convey a defamatory meaning and be actionable even if the words used could not be understood in their literal sense or believed to be true. [Citation.] . . .

"   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"The proper focus of judicial inquiry in a case such as this is not whether the allegedly defamatory statement succeeds as comedy, nor whether its audience thought it to be humorous or believed it to be true; the threshold inquiry is simply whether the communication in question could reasonably be understood in a defamatory sense by those who received it. [Citation.]" (170 Cal.App.3d at pp. 553-554.)

Addressing the alleged defamation in the comedy routine before it, the *Polygram* court explained: "[T]he statements . . . represented a very small part of a rather long comedy performance, were a spoof or parody of advertising practices and wine snobbery based upon the fantasy of a black wine 'tough enough' to be advertised by 'Mean Joe Green.' Williams, who was performing in a nightclub before an audience that knew him as a comedian, not a wine connoisseur, seems to have made it clear that the wine to which he referred did not exist, because his joke was constructed around the rhetorical question 'why are there no black wines like . . . .' Suggestions that the hypothetical wine is a 'motherfucker,' black in color, tastes like urine, goes with anything 'it' damn well pleases, or is 'tough' or endorsed by ruffians are obvious figments of a comic imagination impossible for any sensible person to take seriously. For this reason, and in light of the occasion at which the joke was delivered and the attending circumstances, we conclude that, as a matter of law, it was not defamatory. To hold otherwise would run afoul of the First Amendment and chill the free speech rights of all comedy performers and humorists, to the genuine detriment of our society." (170 Cal.App.3d at pp. 556-557, fns. omitted.)

If a parody could be actionable because, while recognizable as a joke, it conveyed an unfavorable impression, very few journalistic parodies could survive. The butt of the parody is chosen for some recognizable characteristic or viewpoint which is then exaggerated. ■ It is not for the court to evaluate the parody as to whether it went "too far."[2] As long as it is recognizable to the average reader as a joke, it must be protected or the rather common parody issues of newspapers and magazines must cease to exist.

Let a peremptory writ of mandate issue directing respondent court to vacate its order denying summary judgment and enter a new order granting the motion.

Poché, Acting P. J., and Reardon, J., concurred.

The petition of real party in interest for review by the Supreme Court was denied November 10, 1993. Mosk, J., was of the opinion that the petition should be granted.

---

[2]The observation quoted in a footnote in *Polygram* seems appropriate to this proposition: " '*It is fundamental that courts may not muffle expression by passing judgment on its skill or clumsiness, its sensitivity or coarseness; nor on whether it pains or pleases.*' " (170 Cal.App.3d at p. 554, fn. 14, quoting with emphasis from *University of Notre Dame Du Lac v. Twentieth Century-Fox Film Corp.* (1965) 22 A.D.2d 452, 458 [256 N.Y.S.2d. 501].)