**Paul HAMILTON, Appellant–Plaintiff,**

v.

**Morgan PREWETT, Appellee–Defendant.**

No. 14A01–0601–CV–32.

Court of Appeals of Indiana.

Feb. 6, 2007.

resolved.

---

**10.** The record does not indicate how Seandre's Estate's action against the physician was

1236

John R. Price, John R. Price & Associates, Indianapolis, IN, Attorney for Appellant.

Blake Chambers, Waller Chambers & Hanson, Washington, IN, Attorney for Appellee.

## OPINION

BAKER, Judge.

Appellant-plaintiff Paul Hamilton appeals from the trial court's order granting summary judgment in favor of appellee-defendant Morgan Prewett. Specifically, Hamilton claims that the trial court erred in granting Prewett's motion for summary judgment because (1) Prewett failed to designate evidence to support his motion in accordance with Indiana Trial Rule 56(C); (2) the evidence that Prewett did reference in his motion did not demonstrate that Hamilton had failed to prove any element of the defamation per se claim; and (3) Indiana's Strategic Lawsuit Against Public Participation statute [1] (anti-SLAPP statute) does not apply to this case. Because we determine that the trial court properly granted Prewett's motion for summary judgment and that the anti-SLAPP statute does not apply to this case, we affirm the judgment of the trial court and remand with instructions to enter an order denying Prewett's request for attorney's fees.

## FACTS[2]

Prewett and his wife, Georgia Prewett (Georgia), reside in Daviess County. Hamilton maintains his business, Hamilton Water Conditioning, in Daviess County. Neither the record nor the parties' briefs address how the parties were acquainted, if at all. On June 21, 2002, Hamilton filed a lawsuit against the Prewetts in the Daviess County Superior Court after Hamilton found a website entitled "Paul Hamilten—The World's Smartest Man" (the Website), which Hamilton claims defamed him and his business. Hamilton's complaint alleged claims of defamation, intentional infliction of emotional distress, and punitive damages. On September 25, 2002, Hamilton filed an Amended Complaint and added his son, Michael Hamilton[3] (Michael), as a party plaintiff because Michael was the legal owner of Hamilton Water Conditioning.

While there was a one-letter difference between the man on the website, "Paul Hamilten" ("Hamilten"), and appellant Paul Hamilton, Prewett has never denied that he was the author of the Website or represented that the Website was not a reference to Hamilton or Hamilton Water Conditioning. Instead, as detailed below, Prewett argues that the Website was a form of comedy, parody, or satire. The Website was written from the perspective of "Hamilten," a man in the business of water conditioning, and portrayed "Hamilten" as a manipulative individual both personally and professionally. Appellant's App. p. 75–108. For example, the Website stated:

I am a very intelligent, older American male and have my own very successful business dealing with the water conditioning field. I have a Master's Degree in Water Conditioning from Smartass University, a prestigious mail order college. While I am somewhat attractive, I

---

1. Ind.Code. §§ 34–7–7–1 to –10.

2. We heard oral argument at Vincennes University in Vincennes, Indiana on October 24, 2006. We thank the Vincennes University staff and students for their hospitality, and we commend counsel for their excellent oral presentations.

3. Michael is not a party to this appeal. The trial court officially added Michael as a party plaintiff, appellant's app. p. 54, but the motion to correct error and notice of appeal were filed solely by Paul Hamilton without reference to Michael, id. at 134, 158.

am known for my ability to seduce women with my quick wit. I have several methods of attracting women as well as socializing skills, which are in the book I am writing. . . .

\* \* \*

When my employees are installing a unit at a place where their [sic] is a woman at home, I like to get the target alone and tell her that she doesn't have to "pay for this." A couple of winks and boom, you have another sucker hooked. Please note that this only works on women that have half a brain, the more intelligent ones.

\* \* \*

I place an ad in the paper which show [sic] my salt prices well below any other store in town. It is a known fact that few people buy one bag of salt at a time (except in the winter, then I tell them I am out of stock) and generally buy a lot. So I charge them the advertised price on the first bag and inflate it on the rest. . . . [If they ask me why the advertisement didn't say that the price was only for one bag,] I said that it wasn't published but we just knew it, this illustrates how fast I can think!

\* \* \*

Since I have the name of my business on the vehicle, this provides free advertisement. If I am ever challenged [for parking illegally], I just say it is an Emergency vehicle and I am attending a water leak. This shows how stupid other people are, it is illegal to park this way and I know it, ha ha! . . . The Mayor in this town is terrified of me because I am so smart, but occasionally I do have to put him in his place.

\* \* \*

I began stocking conditioned water in large five gallon containers. To turn over the water stock supply and maintain fresh water, I began selling the oldest containers as bottled water. . . . No one is smart enough to test the water for free sodium ions, they will never know it's just softened water in the containers.

*Id.* at 76–78, 103. As quoted in detail in Part II, the Website also contains eight pages of "Customer Testimonials" that describe the life-changing effects of drinking "Hamilten's" water. *Id.* at 91–99. These tongue-in-cheek testimonials, which are quoted in Part II, claim that drinking the water can cure severe facial disfigurement, attract women, and greatly increase the drinker's intelligence quotient.

On December 11, 2002, Georgia moved for partial summary judgment, seeking a dismissal of all claims against her because she was not involved in the creation or posting of the Website. After receiving Georgia's discovery responses and other assurances of her non-participation, the Hamiltons moved to dismiss their complaint against Georgia without prejudice and the trial court granted the motion on February 28, 2005.

On November 8, 2004, Prewett filed a motion to dismiss and for summary judgment (Motion). In his designated evidence, Prewett listed the depositions of himself, Georgia, and Hamilton; however, Prewett did not attach or refer to specific portions of the depositions. *See id.* at 126. In his brief supporting the Motion, Prewett argued that the Hamiltons' suit should be barred by Indiana's anti-SLAPP statute because the Website was made in furtherance of Prewett's right to free speech pursuant to the State and federal Constitutions. The Hamiltons did not respond to Prewett's Motion.

The trial court heard oral argument on the Motion on February 28, 2005, and the Hamiltons argued that they had no duty to respond to Prewett's Motion because he had not designated evidence as required by Indiana Trial Rule 56. The Hamiltons also asserted that the anti-SLAPP statute was not applicable to this case because comedy is not a public interest within the scope of that statute. The oral argument was limited to the adequacy of Prewett's designated evidence and the applicability of the anti-SLAPP statute. On August 16, 2005, the trial court granted Prewett's Motion because "Plaintiff[s have] failed to demonstrate the necessary elements for a cause of action of defamation against Defendant, Morgan Prewett, as a matter of law." *Id.* at 10.

Hamilton filed a motion to correct error on September 9, 2005, but the trial court summarily denied the motion on November 3, 2005. Hamilton now appeals the trial court's grant of summary judgment and the denial of the motion to correct error.

### DISCUSSION AND DECISION

■ Where a motion to correct error is grounded upon a claim that the trial court erred by granting summary judgment, we review on appeal the grant of summary judgment. *Rishel v. Estate of Rishel ex rel. Gilbert,* 781 N.E.2d 735, 738 (Ind.Ct. App.2003). Summary judgment is appropriate only if the pleadings and evidence considered by the trial court show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Owens Corning Fiberglass Corp. v. Cobb,* 754 N.E.2d 905, 909 (Ind.2001); *see also* Ind.

Trial Rule 56(C). On a motion for summary judgment, all doubts as to the existence of material issues of fact must be resolved against the moving party. *Owens Corning,* 754 N.E.2d at 909. Additionally, all facts and reasonable inferences from those facts are construed in favor of the nonmoving party. *Id.* If there is any doubt as to what conclusion a jury could reach, then summary judgment is improper. *Id.*

An appellate court faces the same issues that were before the trial court and follows the same process. *Id.* at 908. The party appealing from a summary judgment decision has the burden of persuading the court that the grant or denial of summary judgment was erroneous. Id. When a trial court grants summary judgment, we carefully scrutinize that determination to ensure that a party was not improperly prevented from having his or her day in court. *Id.* A grant of summary judgment may be affirmed upon any theory supported by the designated evidence. *Bernstein v. Glavin,* 725 N.E.2d 455, 458 (Ind.Ct.App.2000).

### I. Designated Evidence

#### A. The Website

We are initially concerned with whether the Website was before the trial court when it ruled on Prewett's Motion. A copy of the Website was not attached to Hamilton's complaint,[4] appellant's app. p. 51–53, and we questioned the parties at oral argument about the manner in which the Website came before the trial court. Hamilton informed us that he filed a motion to compel Prewett to turn over a copy of the Website and that Prewett complied with his request. While Prewett insists that the trial court considered the Website

---

4. In his brief, Prewett asserts that Hamilton's complaint was deficient because a copy of the Website was not attached to it. Because the parties agree that Hamilton later filed a motion to compel to obtain a copy of the Website, we find that Hamilton's failure to attach the Website to his complaint was not fatal error.

with his Motion because a copy of it was attached to Prewett's deposition—a deposition he claims he designated as evidence with his Motion—we do not have that copy of the Website because none of the allegedly-designated depositions were included in the record on appeal. However, a copy of the Website is included in Hamilton's Appendix because it was attached to the preliminary witness and exhibit list that the Hamiltons submitted to the trial court. Appellant's App. p. 73–108. Because counsel for both parties asserted at oral argument that the trial court considered the Website when it ruled on Prewett's Motion, we will use the copy provided in Hamilton's Appendix.

### B. The Complaint and the Depositions

Hamilton argues that the trial court erred in granting Prewett's Motion because Prewett failed to designate evidence in accordance with Trial Rule 56(C). Specifically, Hamilton asks that we reverse the trial court's grant of summary judgment because Prewett's designation merely listed three depositions, which he did not actually attach to the designation.

■■ Trial Rule 56(C) requires a party filing a motion for summary judgment to "designate to the court all parts of pleadings, depositions, answers to interrogatories, admissions, matters of judicial notice, and any other matters on which it relies for purposes of the motion." Rule 56 also requires the party opposing the motion to designate evidence in support of its position. T.R. 56(C). Indiana courts have held that since the 1991 amendments to Rule 56, a party must designate the *specific* portions of the record upon which the movant relies in order to prevail: "No longer can parties rely without specificity on the entire assembled record—depositions, answers to interrogatories, and admissions—to fend off or support motions for summary judgment. It is not within a

trial court's duties to search the record to construct a claim or defense for a party." *Rosi v. Business Furniture Corp.,* 615 N.E.2d 431, 434 (Ind.1993). Designating the entire record may be considered a failure to make a designation at all, and a denial of summary judgment on this basis is proper. *Holland v. Miami Sys., Inc.,* 624 N.E.2d 478, 483 (Ind.Ct.App.1993). In *Ling v. Stillwell,* we held:

> specificity is the mandate, but how a party chooses to specifically designate material is not mandated and therefore, whether a party chooses to specify evidence in a summary judgment motion, separate filing of designation, or in a memorandum in support or opposition to the motion for summary judgment is within the party's discretion.

732 N.E.2d 1270, 1276 (Ind.Ct.App.2000). Thus, even broad references within a party's motion are specific enough for designation. *Id.* As long as the trial court is apprised of the specific material upon which the parties rely in support of or in opposition to a motion for summary judgment, then the material may be considered. *Id.*

### 1. Interaction Between Rule 56(C) Designation Requirements and Anti–SLAPP Statute

Prewett initially argues that the requirements of Rule 56(C) do not apply to his Motion because his Motion asked the trial court to dismiss the Hamiltons' suit pursuant to the anti-SLAPP statute. Specifically, Prewett argues that the Rule 56 designation requirements do not apply to summary judgment motions made pursuant to the anti-SLAPP statute and, therefore, he was not required to comply with those requirements.

■■ Strategic lawsuits against public participation (SLAPPs) are "meritless suits aimed at silencing a plaintiff's oppo-

nents, or at least at diverting their resources." John C. Barker, *Common–Law and Statutory Solutions to the Problem of SLAPPS,* 26 Loy. L.A. L.Rev. 395, 403 (1993). Indiana adopted the anti-SLAPP statute in 1998, and the ten-section statute applies to "an act in furtherance of a person's right of petition or free speech under the Constitution of the United States or the Constitution of the State of Indiana in connection with a public issue or an issue of public interest." I.C. § 34–7–7–1. The anti-SLAPP statute is intended to reduce the number of lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances. *Poulard v. Lauth,* 793 N.E.2d 1120, 1122 n. 2 (Ind.Ct.App.2003). To reduce the number of lawsuits brought to chill speech, a defendant who prevails on a motion to dismiss under the anti-SLAPP statute is entitled to recover reasonable attorney's fees and costs. I.C. § 34–7–7–7.

We analyzed the relationship between the anti-SLAPP statute and Trial Rule 56 in *Shepard v. Schurz Communications, Inc.,* 847 N.E.2d 219 (Ind.Ct.App. 2006). In *Shepard,* we resolved an inconsistency between the anti-SLAPP statute and Rule 56 in favor of Rule 56. The anti-SLAPP statute provides that summary judgment is appropriate only when the movant has "proven by a preponderance of the evidence" that the act underlying the claim is a lawful act, I.C. § 34–7–7–9, while Rule 56 places a burden upon the movant to make a "prima facie" showing of entitlement to judgment. *Shepard,* 847 N.E.2d at 224. We resolved this inconsistency in favor of Rule 56 because our Supreme Court has the inherent power to establish rules governing the course of litigation in our trial courts, and "[i]t is well-settled that, in the event of a conflict between a procedural statute and a procedural rule

adopted by the Supreme Court, the latter shall take precedence." *Id.* We went on to examine whether the proponent of summary judgment had made a prima facie showing that it was entitled to judgment under Rule 56. *Id.*

Applying the *Shepard* rationale, we find that the Rule 56(C) designation requirements apply to a motion to dismiss filed pursuant to the anti-SLAPP statute. The language of the anti-SLAPP statute states that "the court in which the motion is filed ... shall treat the motion as a motion for summary judgment...." I.C. § 34–7–7–9(a). While the statute does not explicitly state that a party that files a motion pursuant to the statute is required to designate evidence pursuant to Rule 56, we find that the designation requirements of Rule 56(C) did apply to Prewett's Motion.

### 2. *Prewett's Designation*

In his designation of evidence, Prewett listed four items by name only: "1. Deposition of Morgan Prewett; 2. Deposition of Georgia Prewett; 3. Deposition of Paul Hamilton; 4. Amended Complaint filed by Plaintiff[s]." Appellant's App. p. 126. While Prewett did attach the Hamiltons' amended complaint to the designation, he did not attach any portions of the depositions. Prewett argues that he made specific references to portions of the depositions through the brief supporting his Motion; therefore, at the very least, he designated the portions of the depositions referenced in his brief. *See Van Eaton v. Fink,* 697 N.E.2d 490, 494 (Ind.Ct.App. 1998) (holding that a party who had designated thirteen affidavits without providing specific page numbers, with the exception of specific language contained in one paragraph of its response, had properly designated only the evidence referenced in that one paragraph of its re-

sponse). While Prewett did make general references to portions of the depositions in the brief, appellant's app. p. 120–122, 124, we cannot consider those portions of the depositions because the depositions are not part of our record on appeal. Therefore, we will only consider the Hamiltons' amended complaint and, as explained above, the Website as the evidence designated with Prewett's Motion.

## II. Hamilton's Defamation Claim

Hamilton argues that the trial court improperly dismissed his defamation claim as a matter of law. Specifically, Hamilton contends that Prewett did not disprove any of the elements of Hamilton's defamation claim; therefore, the trial court erroneously granted summary judgment in favor of Prewett.

### A. Defamation and Parody

■■■ The law of defamation was created to protect individuals from reputational attacks. *Journal–Gazette Co., Inc. v. Bandido's, Inc.,* 712 N.E.2d 446, 451 (Ind.1999). A defamatory communication is defined as one that " 'tends so to harm the reputation of another as to lower him in estimation of the community or to deter a third person from associating or dealing with him.' " *Doe v. Methodist Hosp.,* 690 N.E.2d 681, 686 (Ind.1997) (quoting Restatement (Second) of Torts § 559 (1977)). To prevail on a cause of action for defamation, a plaintiff must prove four elements: (1) a communication with defamatory imputation, (2) malice, (3) publication, and (4) damages. *Lovings v. Thomas,* 805 N.E.2d 442, 447 (Ind.Ct.App.2004). Communication is defamatory per se if it imputes: (1) criminal conduct, (2) a loathsome disease, (3) misconduct in a person's trade, profession, office, or occupation, or (4) sexual misconduct. *Id.* If the communication is defamatory per se, damages are presumed even without proof of actual harm to the plaintiff's reputation.

■■■ Whether a communication is defamatory "depends, among other factors, upon the temper of the times [and] the current of contemporary public opinion, with the result that words, harmless in one age, in one community, may be highly damaging to reputation at another time or in a different place." *Bandido's,* 712 N.E.2d at 452 n. 6. Whether a communication is defamatory is generally a question of law for the court, but the determination becomes a question of fact for the jury if the communication is reasonably susceptible to either a defamatory or a non-defamatory interpretation. *Gatto,* 774 N.E.2d at 923. To impose liability for defamation, a false statement of fact is required. *Bandido's,* 712 N.E.2d at 457. In determining whether a defamatory meaning is possible, we test the effect that the statement is fairly calculated to produce and the impression it would naturally engender in the mind of the average person. *Id.*

■■■ Turning to parody, it appears that Hoosiers either do not have a parodistic sense of humor or do not file lawsuits over instances of parody because Indiana case law does not address the issue. Therefore, we must look to case law from other jurisdictions for guidance. Parody involves "exaggeration or distortion" and is the means by which the author "clearly indicates to his audience that the piece does not purport to be a statement of fact but is rather an expression of criticism or opinion. . . ."[5] *New Times, Inc. v. Isaacks,*

---

**5.** In *New Times,* the Texas Supreme Court declined to impose liability on a newspaper that published a satirical article entitled "Stop the Madness" that was inspired by the actual arrest of a thirteen-year-old Texan after he submitted a school assignment that contained "terroristic threats." 146 S.W.3d at 147–48. "Stop the Madness" depicted the

146 S.W.3d 144, 158 (Tex.2004), *cert. denied.* "The satiric effect emerges only as the reader concludes by the very outrageousness of the words that the whole thing is a put-on. The comic effect is achieved because the reader sees the words as the absurd expression of positions or ideas associated with the purported author." *Id.* at 159. "In a case of parody or satire, courts must analyze the words at issue with detachment and dispassion, considering them in context and as a whole, as the reasonable reader would consider them." *Id.* at 158.

The United States Supreme Court provided guidance on parody when it declined to impose liability on a magazine that portrayed a parodistic depiction of Jerry Falwell, a popular evangelist, losing his virginity to his mother in an outhouse. *Hustler v. Falwell,* 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988). The Court noted that the parody "could not reasonably be understood as describing actual facts about respondent or action events in which he participated" and that the trial court properly dismissed Falwell's defamation claim. *Id.* at 57, 108 S.Ct. 876. The Court applied the actual malice defamation standard to Falwell's intentional infliction of emotional distress claim (IIED claim) and held that Falwell could not recover on the IIED claim because the parody "was not reasonably believable." *Id.*

■■■ Regarding the relationship between defamation and parody, *American Jurisprudence* provides:

Defamation is, by its nature, mutually exclusive of parody. By definition, defamation requires a false statement of fact; parody, to the degree that it is perceived as parody by its intended audience, conveys the message that it is not the original and, therefore, cannot constitute a false statement of fact.... If a parody could be actionable because, while recognizable as a joke, it conveyed an unfavorable impression, very few journalistic parodies could survive. It is not for the court to evaluate a parody as to whether it went too far, for purposes of a libel claim; as long as it is recognizable to the average reader as a joke, it must be protected or parody must cease to exist.

50 Am.Jur.2d Libel and Slander § 156 (2006).

■■■ The separate concurring opinion criticizes the sources that *American Jurisprudence* cites to support its proposition that defamation and parody are mutually exclusive. We respectfully disagree with the contention that *American Jurisprudence* erroneously summarizes the law because we interpret the "mutually exclusive" proposition to correctly indicate that parody and defamation are two separate classes of speech: "defamation" is speech that is a false statement of fact and "parody" is speech that one cannot reasonably believe to be fact because of its exaggerated nature.

Even if we assume that the cases that the concurring opinion criticizes are invalid and erroneous, language from other court opinions supports the proposition that defamation and parody are mutually exclusive. *Browning v. Clinton,* 292 F.3d 235, 248 (D.C.Cir.2002) (" 'Hyperbole' is protected from defamation claims due to the

---

fictitious arrest and detention of a six-year-old girl for writing a book report about the cannibalism, fanaticism, and disorderly conduct in the popular children's book *Where the Wild Things Are. Id.* at 148. The Texas Supreme Court declined to impose liability because

"[w]hile the reader may initially approach the article as providing straight news, 'Stop the Madness' contains such a procession of improbable quotes and unlikely events that a reasonable reader could only conclude that the article was satirical." *Id.* at 161.

'constitutional protection afforded to parody, satire, and other imaginative commentary' ") (quoting *Moldea v. New York Times Co.*, 22 F.3d 310, 313 n. 2, 314 (D.C.Cir.1994)); *Victoria Square, LLC v. Glastonbury Citizen*, 49 Conn.Supp. 452, 891 A.2d 142, 145 (2006) ("[d]efamation is, by its nature, mutually exclusive of parody ... [a] false statement that is published as a parody cannot be defamatory"); *Kiesau v. Bantz*, 686 N.W.2d 164, 176–77 (Iowa 2004) (referring to parody as an "affirmative defense" to plaintiff's defamation claim); *Stien v. Marriott Ownership Resorts, Inc.*, 944 P.2d 374, 380 (Utah Ct.App. 1997) ("[a] parody or spoof that no reasonable person would read as a factual statement, or as anything other than a joke[,] cannot be actionable as a defamation") (citing *Walko v. Kean College*, 235 N.J.Super. 139, 561 A.2d 680, 683 (1988)). Additionally, four of the cases that the concurring opinion cites to support its position predate the United States Supreme Court's 1988 *Hustler* decision, which shed a fresh light on parody and its unique place in constitutional law. Op. at 1250 (citing *Frank v. Nat'l Broad. Co.*, 119 A.D.2d 252, 506 N.Y.S.2d 869 (N.Y.App.Div.1986); *Polygram Records, Inc. v. Superior Court*, 170 Cal.App.3d 543, 216 Cal.Rptr. 252 (Cal. Ct.App.1985); *Triggs v. Sun Printing & Publ'g Ass'n*, 179 N.Y. 144, 71 N.E. 739 (N.Y.1904); (*Donoghue v. Hayes*, [1831] *Hayes Exch.* 765, 266 [Ire.] )). In light of Hustler and the cases that we cite above, we do not find these pre-Hustler cases to be persuasive.

We do agree with the concurring opinion's conclusion that "an idea or opinion that conveys a defamatory imputation of fact, even if couched in humor, can be actionable." Op. at 1251. However, "fact" is the key word in that sentence. By finding parody and defamation to be mutually exclusive, we are not suggesting that language cannot be defamatory if it is also humorous. A defendant who couches a defamatory imputation of fact in humor *cannot* simply avoid liability by dressing his wolfish words in humorous sheep's clothing. Instead, parody is another beast that goes beyond mere humor. As the United States Supreme Court stated, parody "could not reasonably be understood as describing actual facts...." *Hustler*, 485 U.S. at 57, 108 S.Ct. 876. Therefore, by definition, parody cannot constitute the "false statement of fact" that a defamation claim requires.[6] *Bandido's*, 712 N.E.2d at 457; 50 Am.Jur.2d Libel and Slander § 156 (2006).

### B. The Website

Hamilton first invites us to limit the *Hustler* holding because, whereas it addressed an *IIED claim*, Hamilton contests the trial court's dismissal of his *defamation* claim. We do not find this distinction persuasive because the *Hustler* court explicitly adopted the actual malice standard that it applied to Falwell's IIED claim from its standard for *defamation* claims. *Id.* at 51–53, 56, 108 S.Ct. 876. In addition, the *Hustler* court found that Falwell's IIED claim must fail for the same reason that the trial court properly dismissed his defamation claim: the parody was not "reasonably believable." *Id.* at 57, 108 S.Ct. 876.

---

6. We are not implying that a defendant can never be held liable for a parody. After the *New Times* court found that "Stop the Madness" was a parody, it held that the plaintiffs "could proceed with their claim *only if* they raised a fact issue on actual malice." 146

S.W.3d at 161 (emphasis added). Because Hamilton does not assert that Prewett acted with actual malice, we do not need to further elaborate on the specifics of this standard with regard to parody.

Hamilton also invites us to limit the *Hustler* holding because Falwell was a public figure and Hamilton is a private figure. While this distinction may render *Hustler* instructive rather than controlling, the general principles announced by the United States Supreme Court still guide our decision because of the situational similarities. Like Hustler Magazine, Prewett included a disclaimer on his Website that stated "[D]isclaimer: The character described in this page is fictional, any similarities to a real person is [sic] coincidence and the page is meant for humor." Appellant's App. p. 78. And like the comedic depiction in *Hustler*, Prewett's Website is clearly meant to be parody, and no reasonable person could interpret its assertions to be true. Eight pages of the tongue-in-check Website list "Customer Testimonials" that illustrate the Website's facetious nature:

> I was a very lonely guy until I discovered Paul Hamilten's web site. After learning a few tips on how to attract women, I decided to buy some of the Casanova Water Formula to see if the claims were true. . . . To test out this product, I took a walk in the park and to my surprise women started talking to me and soon a large crowd of the opposite sex were gathered around me. . . . After 2 short days I met my dream woman and asked her hand in marriage. I know that I would never of [sic] had this opportunity if I had not purchased Casanova Water Formula from Paul Hamilten.

> \* \* \*

> I was not very intelligent before I started drinking Paul Hamilten's Water and people made fun of me because I had an IQ of 25. My mother traded for some Hamilten Water and started serving it to me without my knowledge. Soon I learned to read and . . . after 30 days of drinking Hamilten Water, I was designing components for the space shuttle.

> \* \* \*

> I was horribly disfigured at birth and felt I no longer could go on. Just when I was about to jump off the White River bridge, a man came up and told me about Paul Hamilten and his Water products. I talked to Paul and finally agreed to try some of his water. To the amazement of my physician, I had soon developed normal features. . . .

*Id.* at 91–93.

The Website also asserts that in the early 1960's, a group of "Amish Aliens" from another solar system invaded the Earth and are taking over the world by placing minerals in our water. *Id.* at 101. The Website claims that the only way to "get by" is to either submit to the Amish Aliens or "have one of ['Hamilten's'] products installed in [your] home." *Id.*

These examples—which are but a few of many—support the finding, inasmuch as we stand in the trial court's shoes on review, that the Website is not subject to a defamatory interpretation because, as in *Hustler*, no reasonable person could believe its claims to be true. It is not reasonable to believe that merely drinking a specific kind of water can attract women, cure severe facial disfigurement, or raise a low intelligence quotient to the level of a rocket scientist.

Hamilton argues that the Website is subject to a defamatory interpretation because some of the allegations could be interpreted to be false statements of fact. However, "we cannot impose civil liability based on the subjective interpretation of a reader who has formed an opinion about the [Website's] veracity after reading a sentence or two out of context; that person is not an objectively reasonable read-

er." *New Times*, 146 S.W.3d at 159 (citing *Campbell v. Acuff–Rose Music Inc.*, 510 U.S. 569, 583, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994) ("First Amendment protections do not apply only to those who speak clearly, whose jokes are funny, and whose parodies succeed.")). Therefore, Hamilton's argument is unpersuasive because the Website taken as a whole is not subject to a defamatory interpretation.

In light of the parodistic nature of the Website taken as a whole, we hold that the Website is a parody because no reasonable person could believe its claims to be true. Therefore, Hamilton's defamation claim must fail because parody cannot constitute a false statement of fact and cannot support a defamation claim. 50 Am.Jur.2d Libel and Slander § 156 (2006); *New Times*, 146 S.W.3d. at 161. Because the Website is a parody, the trial court properly granted summary judgment in favor of Prewett.[7] *See Gatto*, 774 N.E.2d at 923 (holding that the determination of whether a communication is defamatory is to be presented to the jury as a question of fact *only if* the communication is reasonably susceptible to either defamatory or non-defamatory interpretation).

### III. Anti–SLAPP Statute

After Hamilton filed his notice of appeal, Prewett filed a motion for attorney's fees under the anti-SLAPP statute on November 17, 2005. According to the chronological case summary, the trial court has not yet ruled on this motion. In the interest of judicial economy, both parties ask that we determine whether the anti-SLAPP statute applies to Hamilton's lawsuit.

The anti-SLAPP statute provides that a "prevailing defendant on a motion to dismiss made under this chapter is entitled to recover reasonable attorney's fees," I.C. § 34–7–7–7, and that "[t]he person who files a motion to dismiss must state with specificity the public issue or issue of public interest that prompted the act in furtherance of the person's right of petition or free speech," I.C. § 34–7–7–9(b). As we provided in *Poulard*, "[i]t is apparent from the language of [section 34–7–7–9] that the trial court cannot reach the attorney's fees question until after all actual or potential issues regarding the applicability of the statute have been resolved and a 'prevailing defendant' has been determined." 793 N.E.2d at 1123.

Here, the trial court "grant[ed] the Defendant's [Motion]" because "Plaintiff[s have] failed to demonstrate the necessary elements for a cause of action of defamation against the Defendant, Morgan Prewett, as a matter of law." Appellant's App. p. 10. On appeal, Hamilton questions whether the trial court's grant of summary judgment was a final judgment on all of his claims or a grant of summary judgment on his defamation claim alone. We find that the language of the order did "grant the Defendant's [Motion]," *id.*; therefore, the trial court entered a final judgment on Hamilton's defamation, IIED, and punitive damages claims. Because Prewett's Motion asked the trial court to dismiss all of Hamilton's claims and the trial court granted the Motion, we find that the trial court's order amounted to a final judgment.

We now turn to the viability of Prewett's request for attorney's fees. As we observed in *Poulard*, "The 'anti-SLAPP' statutes, of which Indiana's is typical, are intended to reduce the number of lawsuits

---

**7.** Hamilton does not assert that Prewett created the Website with actual malice. In fact, we do not even know how these parties were acquainted. Consequently, there cannot be a fact issue regarding actual malice because Hamilton does not assert that Prewett acted with such intent.

brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." 793 N.E.2d at 1122 n. 2. In the brief supporting his Motion, Prewett argued that the Motion should be granted pursuant to the anti-SLAPP statute because "satire, parody, and humor are forms of entertainment and thus, are an issue of a public interest." Appellant's App. p. 119.

While we acknowledge that there may be instances where entertainment is a public issue or an issue of public interest that warrants anti-SLAPP protection, we do not find this to be one of those occasions. Hamilton's suit against Prewett, while unsuccessful on the merits, is not the type of lawsuit that the anti-SLAPP statute was enacted to prevent. Unlike the plaintiffs in the previous Indiana anti-SLAPP cases, Hamilton did not file his suit to stifle Prewett's speech on a public issue or an issue of public interest.

The plaintiff in *Poulard* filed a lawsuit against the Michigan City News–Dispatch newspaper and Lyal Lauth for statements Lauth made at the Michigan Shores Town Council meeting that the newspaper printed. 793 N.E.2d at 1122. On appeal, we affirmed the trial court's award of attorney fees to the newspaper and held that Lauth was also entitled to attorney's fees even though he had not incurred fees because the newspaper had defended him. *Id.* at 1124–25.

In *Shepard,* an attorney sued the Mooresville/Decatur Times newspaper over an article it published titled "Monrovia town attorney steamed over letter," which quoted language from a letter that the attorney had written to potential clients. 847 N.E.2d at 221–22. On appeal, we affirmed the trial court's award of attorney fees to the newspaper and held that the newspaper was also entitled to appellate attorney fees under the anti-SLAPP statute. *Id.* at 226–27.

In both of these suits, the defendants successfully filed motions to dismiss under the anti-SLAPP statute because the plaintiffs were attempting to silence media coverage of newsworthy events. While those suits qualified for anti-SLAPP protection and merited an award of attorney's fees, Hamilton's suit against Prewett was not an attempt by Hamilton to silence Prewett's speech on a public issue or an issue of public interest. Therefore, we find that the anti-SLAPP statute does not apply to this case.

## CONCLUSION

The judgment of the trial court is affirmed and remanded with instructions to enter an order denying Prewett's request for attorney's fees.

BAILEY, J., concurs.

NAJAM, J., concurs in result with opinion.

NAJAM, Judge, concurring in result.

I concur in the result because the designated evidence in this record is insufficient to create an issue of fact on the questions of defamatory imputation and malice.[8] On a more complete record, Hamilton might well have created a genuine issue of material fact and avoided summary judgment. More complete designated evidence might well have raised a doubt as to what conclusion a jury could reach and have precluded summary judgment. *See Owens Corning Fiberglass Corp. v. Cobb,* 754 N.E.2d 905,

---

8. Hamilton's appellate counsel did not participate in the proceedings before the trial court and first appeared on behalf of Hamilton after the court had granted Prewett's motion for summary judgment.

908–09 (Ind.2001). The Website suggests that Prewett is not a mere humorist[9] but is pre-occupied with Hamilton. Perhaps evidence outside the four corners of the Website would support an inference for a jury to find that Prewett's motive is not benign. Thus, this case is not far removed from a scenario in which a similarly situated plaintiff could sustain an action for defamation. Had there been evidence of actual malice, parody would not defeat a defamation action as a matter of law.

As an initial matter, I fully concur with most of the majority's opinion. Regarding the majority's discussion of the law of parody, however, I agree with only the following comments, to the extent that they can be separated and read in isolation from the rest of the majority's reasoning: an idea or opinion that conveys a defamatory imputation of fact, even if couched in humor, can be actionable; a defendant who couches a defamatory imputation of fact in humor cannot simply avoid liability by "dressing his wolfish words in humorous sheep's clothing," op. at 1245; and evidence of actual malice may rebut the affirmative defense of parody. Those propositions support the conclusion that parody is not a blanket exemption in the law of defamation, a conclusion with which I concur. Nonetheless, the majority also insists that parody and defamation are "mutually exclusive," implying that parody is entitled to wholesale protection from defamation actions. I cannot concur with the majority's persistent use of that false dichotomy.

Thus, I write separately because I respectfully disagree with the majority's premise that parody and defamation are mutually exclusive and that, therefore, a statement generally characterized as parody is necessarily exempt from an action for

defamation. The majority asserts that, "the Website is not subject to a defamatory interpretation because, as in *Hustler [Magazine v. Falwell,* 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988)], no reasonable person could believe these claims to be true." Op. at 1246. Thus, the majority holds that the Website is not defamatory as a matter of law. I cannot agree with the majority's reasoning. The Website contains statements that, if made with actual malice or reckless disregard for the truth, would constitute defamation per se. "A statement is defamation per se if it imputes: '1) criminal conduct; 2) a loathsome disease; 3) misconduct in a person's trade, profession, office, or occupation; or 4) sexual misconduct.'" *Cortez v. Jo–Ann Stores, Inc.,* 827 N.E.2d 1223, 1230 (Ind.Ct. App.2005) (quoting *Rambo v. Cohen,* 587 N.E.2d 140, 145 (Ind.Ct.App.1992), *trans. denied).* Here, the Website contains statements that impute to Hamilton misconduct in his trade, profession, or occupation, as well as sexual misconduct.

As a procedural matter, the "no reasonable person" standard is restricted in its potential applicability. In *Journal–Gazette, Inc. v. Bandido's, Inc.,* 712 N.E.2d 446, 457 (Ind.1999), our supreme court stated, "[i]t is a question of law for the court to decide whether a statement considered in its entirety is capable of possessing a defamatory meaning or implication. If a statement is susceptible to both defamatory and non-defamatory meanings, the matter of interpretation should be left for the jury." (Citation omitted.) The role of judges as gatekeepers in defamation actions should be limited to those cases where, as here, the nonmoving party wholly fails to designate any evidence that could establish a genuine issue of material

---

**9.** I use parody, satire, humor, caricature, rhetorical hyperbole, and other references to "humorous" statements synonymously.

fact on the questions of defamatory interpretation and actual malice. Whether defamation has in fact occurred, in most cases, should be a question for the jury, and every inference must be indulged in favor of the nonmoving party. *See Cobb*, 754 N.E.2d at 909.

Substantively, the majority opinion relies on a false dichotomy that parody is "mutually exclusive" of defamation—that is, a fact that is somehow humorous cannot, at the same time, be defamatory. Op. at 1244. This dichotomy applies, erroneously, the "principle of bivalence," a logic tracing back to Aristotle, which asserts that a proposition must be either "A" or "not A." Under the majority's premise, without regard to malice, an otherwise defamatory statement is not actionable if it is clothed in parody. The majority assumes, incorrectly, that parody, satire, or rhetorical hyperbole are a prophylactic against defamation.

In the absence of Indiana precedent, the majority relies on "generally applicable authority," namely, a treatise on American jurisprudence. But a close reading of that section of the treatise and the opinions it relies upon demonstrates that the proposition cited by the majority is not supported by the cases cited in the treatise. Specifically, the treatise purports to draw authority from three California cases and one New York case. But the first California case, *Patrick v. Superior Court*, 27 Cal. Rptr.2d 883 (Cal.Ct.App.1994), was withdrawn as a publishable order by the California Supreme Court. As such, that case is not law even in California. *See* Cal. R. of Court 977. The second and third California cases, San *Francisco Bay Guardian v. Superior Court*, 17 Cal.App.4th 655, 21 Cal.Rptr.2d 464 (Cal.Ct.App.1993), and *Polygram Records, Inc. v. Superior Court*, 170 Cal.App.3d 543, 216 Cal.Rptr. 252, 257–59 (Cal.Ct.App.1985), respectively,

both support the position that parody and defamation are in fact *not* mutually exclusive. As the California Court of Appeals stated, "forms of humor which ridicule may in certain circumstances convey a defamatory meaning and be actionable." *San Francisco Bay Guardian*, 21 Cal. Rptr.2d at 467. *See also Polygram Records*, 216 Cal.Rptr. at 258 n. 11. That principle is also endorsed in New York: "the danger implicit in affording blanket protection to humor or comedy should be obvious[:] ... one's reputation can be as effectively and thoroughly destroyed with ridicule as by any false statement of fact." *Frank v. Nat'l Broad. Co.*, 119 A.D.2d 252, 506 N.Y.S.2d 869, 875 (N.Y.App.Div.1986) (citing *Triggs v. Sun Printing & Publ'g Ass'n*, 179 N.Y. 144, 71 N.E. 739, 742 (N.Y.1904); *Donoghue v. Hayes*, [1831] Hayes Exch. 265, 266 [Ire.] ). Thus, the sources cited in the treatise do not support the proposition that "[d]efamation is, by its nature, mutually exclusive of parody." *See* 50 Am.Jur.2d Libel & Slander § 156 (2006).

Additionally, the majority asserts that the California and New York cases cited above are irrelevant in light of the more recent decision in *Falwell*. Although the majority gives no consideration to the Supreme Court's still more recent decision in *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18–19, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), which limited its holding in *Falwell* and is in line with the California and New York cases, it is worth noting the contradictory nature of the majority's position. The majority in one breath relies on the secondary treatise as authoritative, but in another repudiates the very sources that treatise relies on as antiquated. Indeed, the majority's entire discussion of "parody" is contradictory. The majority defines parody as a statement that cannot reasonably be interpreted as stating an actual fact, and therefore as a statement that is

not actionable, but goes on to emphasize that a defendant cannot simply avoid liability by "dressing his wolfish words in humorous sheep's clothing." Op. at 1245.

Here, the majority's complete separation of parody from defamation is grounded in the notion that where there is parody, there cannot also be defamation. But the *Milkovich* Court explicitly held that there is no "wholesale defamation exception for anything that might be labeled 'opinion'" rather than "fact." *Milkovich,* 497 U.S. at 18–19, 110 S.Ct. 2695. Hence, what is relevant for the application of First Amendment principles is not the category of speech that is at issue, but whether the facts asserted are capable of defamatory imputation. *See Milkovich,* 497 U.S. at 21, 110 S.Ct. 2695.

Thus, an idea or opinion that conveys a defamatory imputation of fact, even if couched in humor, can be actionable. As the Illinois Supreme Court recently stated:

> there is no artificial distinction between opinion and fact: a false assertion of fact can be defamatory even when couched within apparent opinion or rhetorical hyperbole.... *Dubinsky v. United Airlines Master Executive Council,* 303 Ill. App.3d 317, 324, 708 N.E.2d 441, 236 Ill.Dec. 855 (1999) ("expressions of opinion may often imply an assertion of objective fact and, in such cases, would be considered actionable"). Indeed, "[i]t is well established that statements made in the form of insinuation, allusion, irony, or question, may be considered as defamatory as positive and direct assertions of fact." *Berkos v. National Broadcasting Co.,* 161 Ill.App.3d 476, 487, 515 N.E.2d 668, 113 Ill.Dec. 683 (1987). Similarly, "[a] defendant cannot escape liability for defamatory factual assertions simply by claiming that the statements were a form of ridicule, humor or sarcasm." *Kolegas [v. Heftel*

*Broad. Corp.],* 154 Ill.2d [1,] 16 [607 N.E.2d 201] [Ill. 1992]. The test is restrictive: a defamatory statement is constitutionally protected only if it cannot be reasonably interpreted as stating actual fact. *Kolegas,* 154 Ill.2d at 14–15, 180 Ill.Dec. 307, 607 N.E.2d 201.

*Solaia Tech., LLC v. Specialty Publ'g Co.,* 221 Ill.2d 558, 304 Ill.Dec. 369, 852 N.E.2d 825, 840 (2006).

Here, the majority maintains that facts underlying parody and defamation are mutually exclusive and, hence, that if there is parody there is no defamation. That is, the majority insists that the category of speech controls the outcome. Along with the courts cited above, I believe this to be an erroneous and oversimplified statement of the law. What matters is not the category of speech, but whether the facts support a defamatory imputation. As such, facts mingled with humor may nonetheless be defamatory. In considering this, a court must look to the entirety of the statement and evidence supporting a finding of actual malice. If the only conclusion that can be reached is that the statement was so obviously in jest that no reasonable person would conclude that the statement was one of fact, then the action for defamation cannot stand. However, even a statement uttered in jest may contain express or implied facts that are defamatory. Parody is an effective defense only when the jest in its entirety cannot reasonably be interpreted as stating or implying any false fact, but that conclusion does not mean that parody and defamation are mutually exclusive.

Humor may sugarcoat a defamatory barb, but if the barb contains an assertion of fact that is false and made with malice or reckless disregard for the truth the barb may be deemed defamatory. The fact that a statement may be uttered in jest does not necessarily insulate that

statement from an action for defamation. An otherwise humorous statement may have embedded within it an express or implied assertion of fact that would support a defamatory imputation if malice can be shown. Again, as the Illinois Supreme Court recognized, "expressions of opinion may often imply an assertion of objective fact and, in such cases, would be considered actionable." *Solaia Tech.*, 304 Ill. Dec. 369, 852 N.E.2d at 840 (quoting *Dubinsky*, 236 Ill.Dec. 855, 708 N.E.2d at 447).

On this record, I am bound to conclude that Hamilton has failed to rebut the defense of parody, having not designated evidence showing there is a genuine issue of material fact on the questions of defamatory imputation and actual malice. But I do not find Prewett's website entirely humorous. The suggestion that Hamilton's female customers are his targets and that he routinely offers to exchange professional services for sexual favors is potentially libelous. On a properly designated record, an issue of fact on the questions of defamatory imputation and actual malice might well preclude summary judgment. Accordingly, I concur in result.